EL PUEBLO DE PUERTO RICO, apelado, *v.* PEDRO FALÚ MARTÍNEZ y OTROS, acusado y apelante.

*Número:* CR-82-38    *Resuelto:* 15 de enero de 1986

Froilán Pérez Montfort, Margarita Carrillo, de la Sociedad para Asistencia Legal y Flavio Álvarez Cobián, abogados del apelante; Josefa A. Román García, Procuradora General Auxiliar, abogada de El Pueblo.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

"La dignidad del ser humano es inviolable." "Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada y familiar." Estos pronunciamientos de nuestra Constitución alcanzan a aquellas personas que, desviadas del orden social, por sus propios merecimientos pierden su libertad mientras pagan

su deuda a la comunidad, recluidos en prisión. Ello les somete por necesidad a restricciones que en el caso de otros seres humanos constituirían violaciones de esos derechos fundamentales.

## I

Los aquí apelantes fueron convictos, luego de un juicio por tribunal de Derecho, por asesinato en primer grado y varias infracciones de la Ley de Armas. Los hechos ocurrieron en la madrugada del 4 de diciembre de 1981. Los apelantes formaban parte de un grupo de cerca de treinta reclusos confinados en la galera C de la Cárcel de Distrito de Arecibo. Parte del grupo lo eran Luis A. Mártir Goicochea, Senén Montalvo Alequín y Víctor Fajardo. Mártir fue muerto, los otros resultaron heridos.

La prueba de cargo estableció que en la noche del 3 de diciembre los acusados apelantes y Víctor Fajardo, estuvieron reunidos en el pasillo entre dos literas de la galera e ingirieron una bebida fermentada que ellos mismos preparaban, llamada "múcura". Se emborracharon. Surgió una discusión entre ellos en relación con el asesinato de un recluso de la Penitenciaría Estatal. Fajardo imputaba la muerte del recluso a los aquí coapelantes Pimentel Serrano y López Rivera. Intervino el coacusado Falú Martínez, quien les exhortó a no seguir discutiendo y que "lo arreglaran otro día". Se fueron a dormir entre once y once y treinta de esa noche.

En la madrugada, entre dos y dos y treinta, fueron apuñalados y cortados con armas fabricadas en la prisión Mártir Goicochea, Montalvo Alequín y Fajardo mientras estaban en sus respectivas literas. A los gritos de uno de ellos —Montalvo Alequín— acudieron dos guardias del penal, uno de los cuales hizo uso de su revólver y disparó al aire dos veces.

Los heridos fueron conducidos al hospital. El occiso permaneció en el suelo, donde fue hallado. Prontamente esa

misma madrugada se inició la investigación de rigor, con la participación de un fiscal.

Como parte de la investigación se hizo un registro de la galera. Aparecieron varias armas punzantes de fabricación casera, todas limpias. Se segregó a los reclusos en la galera C y se les desnudó y examinó el cuerpo en busca de posibles heridas o sangre. Con su consentimiento se les tomaron muestras de sangre a todos, toda vez que en algunas piezas de vestir y collares y en una mano de Falú Martínez había manchas de sangre.

Se tomaron declaraciones a Montalvo Alequín en el hospital y se le mostraron numerosas fotografías de reclusos de la institución. Identificó a los ocho acusados aquí apelantes, a quienes conocía, como los que les agredieron: a él, a Fajardo, y a Mártir. Montalvo fue el testigo principal de la acusación fiscal.

Los apelantes imputan al tribunal sentenciador la comisión de cinco errores, que pasamos a considerar.

## II

Los señalamientos primero y segundo se refieren a la admisibilidad de los análisis de sangre. Alegan los apelantes que las muestras se obtuvieron en una "etapa crítica", sin que se les advirtieran sus derechos, en particular, el de estar asistidos de abogado. Aducen que no medió de parte de ellos una renuncia libre y voluntaria a no incriminarse al requerírseles que se sometieran al análisis de sangre, y que ello constituyó una violación de la garantía constitucional contra registros ilegales e irrazonables.

En primer lugar, cabe apuntar que tanto los apelantes como el Estado hacen acopio de citas referentes a las advertencias que deben hacerse a un sospechoso de delito a quien se extraen manifestaciones incriminatorias. Aparte de que la prueba de cargo estableció que se hicieron tales advertencias a todos los reclusos de la galera C, hecho que el tribunal de ins-

tancia dio por satisfecho, en el caso de autos no se obtuvieron manifestaciones incriminatorias de ninguno de los imputados. Ellos declararon no saber nada.

■ El planteamiento sobre su derecho a asistencia de abogado en esa etapa investigativa de los procedimientos es también inmeritorio. Los reclusos que se hallaban en la galera cuando se asesinó a Mártir Goicochea y se agredió e hirió a Montalvo Alequín y a Fajardo no eran todos sospechosos de haber participado en esos hechos. Recuérdese que los hechos ocurrieron en horas de la madrugada, cuando debía presumirse que todos dormían. Era lógico pensar que algunos, pero no que todos participaron. Y las sospechas no recaían en ese momento sobre algunos en particular. Además, hubiese sido prácticamente imposible proveer de abogados a todos ellos en aquel momento, aparte de que el éxito de la investigación dependía de que se hiciera prontamente, sin dilaciones que la frustrasen.

■ En *United States* v. *Gouveia*, 81 L.Ed.2d 146, 155 (1984), el Tribunal Supremo federal se enfrentó a un planteamiento similar. Varios confinados de una prisión federal fueron mantenidos en "detención administrativa" mientras se investigaba el asesinato de un recluso, y así mantenidos hasta que diecinueve meses más tarde se les acusó por un gran jurado. Fue entonces que se les proveyó asistencia de abogado. Al resolver que no se violó su derecho bajo la Sexta Enmienda señaló el tribunal que ese derecho aplica solamente cuando se han iniciado procedimientos judiciales adversativos contra el imputado, y no antes. Expresó el tribunal:

> Thus, given the plain language of the Amendment and its purpose of protecting the unaided layman at critical confrontations with his adversary, our conclusion that the right to counsel attaches at the initiation of adversary judicial criminal proceedings "is far from a mere formalism." *Kirby* v. *Illinois,* 406 US, at 689, 32 LEd2d 411, 92 SCt 1877. It is only at that time "that the government has committed itself

834

to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law."

■ Al ser segregados los reclusos de la galera e iniciarse la investigación, no había comenzado proceso adversativo contra ellos, que requiriese la asistencia de abogado. El derecho constitucional a estar asistido de abogado no ampara a los confinados que son segregados administrativamente durante el curso de una investigación. Es cuando se centra la investigación en alguno o algunos en particular con miras a obtener de éstos manifestaciones incriminatorias que comienza el procedimiento adversativo y se hace imperativo advertirle su derecho a asistencia de abogado y proveérselo.

■ En cuanto al derecho a no incriminarse, es doctrina harto conocida que tal derecho está limitado a manifestaciones orales. Expresamos en *Pueblo v. Adorno Quiñones*, 101 D.P.R. 429, 432–433 (1973):

Se ha aceptado generalmente que el privilegio contra autoincriminación no protege contra la compulsión de someterse a toma de huellas digitales, fotografías o medidas; escribir o hablar a los fines de ser identificado; presentarse al tribunal, ponerse de pie, adoptar determinada posición, andar o hacer un gesto particular. Lo que el privilegio sí excluye son las comunicaciones o testimonio del individuo, no la evidencia real o física derivada de la persona del sospechoso o acusado. *Holt v. United States*, 218 U.S. 245; *Schmerber v. California*, 384 U.S. 757. Cuando en línea de identificación (*line-up*) se obligó al acusado de robar en un banco a repetir las palabras que alegadamente había pronunciado el ladrón, no se consideró infringido el precepto relativo a autoincriminación pues según criterio del Supremo Federal "se exigió del acusado que usara su voz como característica física de su identidad, no para declararse culpable."

El razonamiento de esta norma lo expresamos en *Pueblo* v. *Aspurúa*, 61 D.P.R. 252, 255–256 (1943), citado con aprobación en *Pueblo* v. *Adorno Quiñones*, supra, pág. 432: " 'El privilegio protege al individuo de hacer revelaciones *que se pretenda arrancarle como testigo en un proceso legal en su contra* . . . El límite del privilegio es claro . . . una inspección de las características físicas por el Tribunal o por los testigos no puede constituir una violación del privilegio, porque no exige nada del acusado como testigo, esto es, con la responsabilidad de su testimonio . . . lo que se obtiene del acusado por medio de ese acto no es una declaración acerca de su cuerpo sino su cuerpo en sí.' " (Énfasis del original.)

Por otro lado, los apelantes invocan la garantía contra registros y allanamientos irrazonables al argumentar sobre el alegado error que nos ocupa. En *Pueblo* v. *Colón Báez*, 96 D.P.R. 632, 636 (1968), expresamos que el registro que se hizo de un confinado al regresar de un pase respondió a "una rutina necesaria y adecuada en nuestras instituciones penales", y no violó su derecho constitucional contra registros irrazonables. (¹)

Aunque la situación es distinta, se impone igual solución frente al planteamiento expresado. Ello no quiere decir que un confinado no deba merecer protección contra ataques a su intimidad. El principio de inviolabilidad de la dignidad del ser humano no puede limitarse a los que viven libremente en la comunidad. Traspone las rejas de las prisiones, porque tras de ellas, quienes pagan su deuda a la sociedad son también seres humanos.

Pero no podemos ignorar que quienes cumplen condenas de prisión están privados, por sus propios merecimientos, de uno de los más sagrados derechos del ser humano: el derecho a la

---

(¹)En ese caso se ocupó al confinado Colón Báez la droga narcótica conocida por heroína, y fue convicto por ello.

libertad. Ello obliga a un régimen disciplinario riguroso para la protección de la sociedad y para la protección de ellos mismos.

Los hechos de este caso son un ejemplo dramático de esa necesidad. Los apelantes se proveyeron clandestinamente de puñales y cuchillos, armas mortíferas que en la misma prisión se fabrican, y en el silencio y la quietud de la madrugada la emprendieron a puñaladas contra tres compañeros. Incidentes como este no son aislados. Los medios noticiosos nos informan casi a diario de agresiones, muertes, amotinamientos y fugas de nuestras prisiones. La evitación de tales males obliga a que se tomen medidas no siempre deseables, pero claramente necesarias.

El Tribunal Supremo federal ha resuelto que un confinado no tiene una expectativa razonable de intimidad en su celda que le brinde protección constitucional contra registros y allanamientos irrazonables. Los confinados no están fuera del alcance de la Constitución; poseen aquellos derechos que no resulten incompatibles con los propósitos del confinamiento. *Hudson* v. *Palmer*, 468 U.S. 517, 524 (1984). A estos efectos se dijo en dicho caso:

> . . . These constraints on inmates, and in some cases the complete withdrawal of certain rights, are "justified by the considerations underlying our penal system." . . . The curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of "institutional needs and objectives" of prison facilities, . . . chief among which is internal security. (Citas omitidas.)

Las prisiones son lugares de cautiverio involuntario de personas que no han sido capaces de ajustarse a las normas de convivencia pacífica y ordenada, dispuestas por la sociedad en sus leyes. Su peligrosidad y la protección de los empleados, personal administrativo, visitantes y de ellos mismos obligan a que se tomen rigurosas medidas de seguridad. Entre ellas, es necesario interceptar la posible introducción ilícita de ar-

mas y drogas a la institución penal, así como prevenir las fugas. No es posible cumplir estos objetivos si se reconoce a los reclusos un derecho irrestricto a su intimidad en sus celdas, precisamente donde pueden ocultar armas, drogas y otros artículos de contrabando. *Hudson* v. *Palmer*, supra. Véanse además: *Bell* v. *Wolfish*, 441 U.S. 520 (1979), y *Lanza* v. *New York*, 370 U.S. 139 (1962). Para ejemplo, en *Block* v. *Rutherford*, 468 U.S. 576 (1984), se resolvió que aquellos detenidos que aguardan juicio no tienen un derecho constitucional bajo la Cuarta Enmienda o bajo la cláusula del debido procedimiento de la Enmienda XIV a estar presentes cuando funcionarios de la prisión hacen registro de sus celdas.

■ No estamos resolviendo que tales normas deban aplicarse aquí. Nuestra Constitución, aunque tuvo a la federal por modelo, se fraguó en época reciente y ha podido ser más explícita en cuanto al reconocimiento de derechos que, en lo que respecta a la Constitución federal, han tenido que reconocerse jurisprudencialmente. Por ello podemos ir más allá de las fronteras limitativas de la jurisprudencia federal, incluso la del Tribunal Supremo. *Pueblo* v. *Ríos Álvarez*, 112 D.P.R. 92 (1982); *Pueblo* v. *Dolce*, 105 D.P.R. 422 (1976). De igual manera pueden hacerlo los Estados, y así lo ha reconocido el Tribunal Supremo, precisamente con respecto a la garantía contra registros y allanamientos irrazonables. *Cooper* v. *California*, 386 U.S. 58, 62 (1967); *Sibron* v. *New York*, 392 U.S. 40, 60–61 (1968).

■ El derecho a la intimidad, consubstancial al principio de inviolabilidad de la dignidad del ser humano, no es sin embargo, un derecho en abstracto. Al reconocérsele en nuestra Constitución se le condiciona. Dice la Carta de Derechos, Sec. 8:

> Toda persona tiene derecho a protección de ley contra ataques *abusivos* a su honra, a su reputación *y a su vida privada o familiar*. (Énfasis suplido.)

■ El mandato constitucional de que se proteja a las personas contra ataques *abusivos* a su intimidad tiene por fuerza que examinarse teniendo presente consideraciones de tiempo y lugar. Sería abusivo irrumpir en el hogar de un matrimonio para registrarlo, sin orden de allanamiento debidamente expedida por autoridad judicial. No puede decirse que sea abusivo registrar la celda de un confinado como parte de las medidas cautelares necesarias para preservar el orden en la institución penal, y que para ello se necesite una orden de allanamiento. Las circunstancias imperantes en la Cárcel de Distrito de Arecibo en la madrugada del 4 de diciembre de 1981 justificaban que se tomaran las medidas informadas.

■ En cuanto a si la obtención de muestras de sangre de los confinados sin orden judicial previa constituye un "registro" o "incautación" contraria a la Constitución, no habíamos tenido ocasión de expresarnos. En la esfera federal se resolvió en *Schmerber* v. *California*, 384 U.S. 757, 767 (1966), que la Cuarta Enmienda protege a las personas de la toma de muestras de sangre sin su consentimiento. Se dijo lo siguiente:

> . . . But if compulsory administration of a blood test does not implicate the Fifth Amendment, it plainly involves the broadly conceived reach of a search and seizure under the Fourth Amendment. . . . It could not reasonably be argued, and indeed respondent does not argue, that the administration of the blood test in this case was free of the constraints of the Fourth Amendment. Such testing procedures plainly constitute searches of "persons," and depend antecedently upon seizures of "persons," within the meaning of that Amendment.

■ Por constituir dicha intervención un registro, está sujeta al requisito de orden judicial. *"Search warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned."* (Énfasis nuestro.) *Schmerber* v. *California*, supra, pág. 770, y *Winston* v. *Lee*, 53 U.S.L.W.

4367 (U.S. Marzo 20, 1985). En *E. L. A.* v. *Coca Cola Bott. Co.*, 115 D.P.R. 197, 207–208 (1984), resolvimos que "sujeto a contadas excepciones de alcance rigurosamente definido, la garantía contenida en la Sec. 10 del Art. II de la Constitución de Puerto Rico cubre tanto los registros administrativos como los penales. La regla general es, en consecuencia, que todo registro, allanamiento o incautación que se realice, no importa su índole penal o administrativa, es irrazonable per se de llevarse a cabo sin orden judicial previa. . . . [l]a regla general prevalece, a menos que se consienta al registro, directa o indirectamente, o circunstancias de emergencia requieran lo contrario y el peso de los intereses en conflicto exija una solución distinta".

En el citado caso de *Hudson* v. *Palmer*, supra, págs. 527–528, se dijo:

> Determining whether an expectation of privacy is "legitimate" or "reasonable" necessarily entails a balancing of interests. The two interests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell. The latter interest, of course, is already limited by the exigencies of the circumstances: A prison "shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room.". . . We strike the balance in favor of institutional security, which we have noted is "central to all other corrections goals,". . . A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that "[l]oss of freedom of choice and privacy are inherent incidents of confinement." (Citas y escolio omitidos.)

■ En el presente caso se configuró una de las excepciones al requisito de orden judicial previa, pues los confinados

consintieron a la toma de las muestras de sangre. El Ministerio Público estableció convincentemente que el consentimiento prestado por los confinados fue válido y no bajo coacción. La defensa no controvirtió satisfactoriamente este hecho.

## III

Los señalamientos de errores tercero y cuarto pueden también considerarse conjuntamente y así lo hacemos. Se refieren a que el Estado no cumplió una orden del tribunal para poner a disposición de la defensa las muestras de sangre tomadas y los resultados de sus análisis, ni entregó la totalidad de las fotografías utilizadas para identificar a los acusados. Alegan los apelantes que ello les privó del derecho a presentar prueba exculpatoria y violentó su derecho a un debido procedimiento de ley y a un juicio justo. Estos planteamientos carecen de mérito.

La prueba estableció que se tomaron muestras de sangre a todos los confinados de la galera C, incluso al occiso y a los confinados heridos. Se levantó en una gaza una mancha de sangre que presentaba Falú Martínez en una mano, pero resultó insuficiente para analizarla y determinar su tipo. También se hizo un examen serohematológico en relación con piezas de ropa, zapatos *tennis* y collares ocupados.

Se determinó la presencia de sangre humana tipo A en la camisa y el pantalón del acusado Pacheco Rohena, que podía datar de hasta dos meses. Precisamente ese es el tipo de sangre de dicho acusado.

En el zapato *tennis* se halló sangre humana tipo O, pero no pudo determinarse su genotipo. El occiso, los dos confinados heridos y el acusado Falú Martínez son tipo O. Ese fue también el tipo de sangre encontrado en los collares de Falú Martínez. La sangre podía pertenecer a cualquiera de ellos y a cualquier otra persona de ese tipo O.

Las demás muestras de sangre fueron destruidas. Como puede colegirse, esta prueba no jugó papel significativo

en el resultado del proceso. Además, la defensa, si lo deseaba, pudo haber obtenido sus propias muestras de sangre. El tipo de sangre de las personas permanece inalterado.

En cuanto a las fotografías, éstas tampoco jugaron papel alguno. Fueron utilizadas cuando se interrogó al testigo herido Senén Montalvo. Su identificación de los acusados no tenía que basarse ni se basó en dichas fotografías, pues éste los conocía bien. Durante varios meses compartió con ellos en la misma galera. Las fotografías sirvieron más bien como prueba corroborativa de su testimonio, creído por el juez que presidió el juicio.

## IV

■ El quinto señalamiento de error va dirigido a impugnar la apreciación de la prueba. Hemos leído y analizado la exposición narrativa de los testimonios prestados y no hallamos base para sostener dicho apuntamiento de error. Es cierto que el testigo Senén Montalvo incurrió en contradicciones y admitió haber mentido en otro proceso en que se le ofreció inmunidad. Pero todo ello va dirigido a la credibilidad del testigo, y el juez que lo vio y oyó declarar estaba en mejor posición que nosotros para creerle o no creerle. *Pueblo* v. *Díaz Ríos*, 107 D.P.R. 140 (1978); *Pueblo* v. *Vázquez López*, 98 D.P.R. 15 (1969). Los testimonios creídos por el tribunal y toda la prueba son suficientes en Derecho para establecer la culpabilidad de los acusados más allá de duda razonable.

## V

Por los fundamentos expresados, *y por estar ajustadas a Derecho las sentencias impuestas —cinco de los apelantes fueron sentenciados como delincuentes habituales— las sentencias apeladas serán confirmadas.*

El Juez Asociado Señor Negrón García concurre en el resultado sin opinión escrita. El Juez Presidente Señor Pons Núñez no intervino.