Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE MAYAGÜEZ
PANEL ESPECIAL

| EL PUEBLO DE PUERTO RICO  Apelado  v.  GIOVANNI M. DURÁN GUTIÉRREZ  Apelante | KLAN202200681 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez  Casos Núm.: ISCR202100150 ISCR202100151 ISCR202100152 I1CR202000254 I1CR202000255  Sobre: Art. 190 Grave, Art. 6.05 Ley de Armas Grave, Art. 6.14 Ley de Armas Grave, Art. 177 Menos Grave, Art. 248 Menos Grave |
|---|---|---|

Panel especial integrado por su presidenta, la juez Domínguez Irizarry, la juez Rivera Marchand y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 28 de marzo de 2025.

Comparece ante nos la parte apelante, Giovanni Durán Gutiérrez, y nos solicita que revoquemos las sentencias dictadas en su contra por el Tribunal de Primera Instancia, Sala Superior de Mayagüez, el 23 de febrero de 2022. Mediante dichos dictámenes, el foro primario condenó al apelante a cincuenta y tres (53) años y diez (10) meses de cárcel por la comisión de varios delitos imputados, así como el pago de una pena especial.

Por los fundamentos que exponemos a continuación, se confirman las *Sentencias* apeladas. Veamos.

### I

Por hechos ocurridos el 16 de septiembre de 2020, se presentaron denuncias y acusaciones en contra de Giovanni Durán

Gutiérrez (Durán Gutiérrez o apelante) por alegadas infracciones al Artículo 177 (amenazas), el Artículo 190(e) (robo agravado cuando medie el uso de un arma de fuego en la comisión del delito) y el Artículo 248(a) (uso de disfraz en la comisión del delito para evitar que se le identifique) del Código Penal de Puerto Rico de 2012, Ley Núm. 146-2012, según enmendada, 33 LPRA secs. 5243, 5260(e) y 5338(a); al Artículo 6.05 (portación, transportación o uso de armas de fuego sin licencia) y el Artículo 6.14(a) (disparar o apuntar armas de fuego) de la *Ley de Armas de Puerto Rico de 2020*, Ley Núm. 168-2019, según enmendada, 25 LPRA secs. 466d y 466m(a).[1]

Culminados los trámites procesales de rigor, el juicio fue celebrado por tribunal de derecho los días 23 y 24 de noviembre de 2021.

A continuación, exponemos un resumen del testimonio más relevante de cada uno de los testigos, según fue vertido durante el juicio.

### Nylma Rivera Padilla

El desfile de prueba comenzó con el testimonio de Nylma Rivera Padilla (Rivera Padilla), quien indicó que conoció a Durán Gutiérrez en Bayamón en el año 2020 y fue su pareja por cuatro (4) meses.[2] Asimismo, identificó en sala a Durán Gutiérrez.[3] Manifestó que, para el 16 de septiembre de 2020, fecha del asalto en un puesto de gasolina en Mayagüez, era pareja de Durán Gutiérrez.[4] Relató que, en dicha fecha, salió de su casa con Durán Gutiérrez para buscar a Oscar A. Olivo Crespo (Olivo Crespo) en un vehículo modelo *Tucson*, color vino, propiedad de Durán Gutiérrez.[5] Aclaró que ella

---

[1] Véase, *Acusación* en los autos originales de los casos ISCR202100150, ISCR202100151 y ISCR202100152, así como las *Denuncias* en los autos originales de los casos I1CR202000254 y I1CR202000255.
[2] Transcripción de la prueba oral (TPO), pág. 25, líneas 1-30.
[3] Íd., pág. 26, líneas 3-9.
[4] Íd., líneas 19-30.
[5] Íd., pág. 27, líneas 11-20.

también utilizaba el vehículo.[6]

Rivera Padilla declaró que, junto a Durán Gutiérrez, buscaron a Olivo Crespo en el residencial Las Violetas en Vega Alta, con el propósito de "dar vueltas por ahí" y asaltar unos puestos de gasolina.[7] Especificó que Durán Gutiérrez manejaba el automóvil, Olivo Crespo estaba en el asiento de atrás, mientras que ella estaba ubicada en el asiento del pasajero delantero.[8] Declaró que llegaron a Mayagüez a las 12:30 a.m., se detuvieron en dos puestos de gasolina y el asalto fue a la "una y pico".[9]

En particular, Rivera Padilla narró que se bajó del carro junto a Olivo Crespo para comprar unos refrescos en el primer puesto de gasolina.[10] Añadió que, luego de la compra, regresaron al vehículo; Durán Gutiérrez estacionó el automóvil más adelante, se bajó de este, pero después regresó molesto.[11] Mencionó que siguieron dando varias vueltas en el carro hasta llegar al próximo puesto de gasolina, en el cual se bajó con Olivo Crespo y compró una pipa de cristal, un refresco marca *Coco Rico* y un chocolate marca *Snickers*.[12] Especificó que le pidió la pipa a un muchacho que trabajaba en el puesto de gasolina, a quien describió como "gordito" e identificó en sala.[13] Describió que el muchacho se encontraba dentro de una "casita"/"cuartito", donde se encontraba la caja registradora y el área de cobro.[14] Relató que este salió para darle la pipa que se encontraba afuera del "cuartito", detrás de un cristal bajo llave.[15] Comentó que, una vez le entregaron la pipa, procedió a comprar los artículos antes mencionados y regresó al vehículo junto a Olivo

---

[6] TPO, pág. 28, líneas 18-21.
[7] Íd., pág. 29, líneas 5-26.
[8] Íd., líneas 27-29; pág. 30, líneas 1-2, 17-25.
[9] Íd., pág. 31, líneas 15-23.
[10] Íd., líneas 15-28; pág. 32, líneas 1-3.
[11] Íd., pág. 32, líneas 5-7.
[12] Íd., líneas 16-17; pág. 33, líneas 1-10.
[13] Íd., pág. 33, líneas 15-29.
[14] Íd., pág. 34, líneas 10-11.
[15] Íd., líneas 16-19; pág. 35, líneas 13-15.

Crespo.[16]

Según detalló Rivera Padilla, Durán Gutiérrez se encontraba en el automóvil y la envió a buscar otra pipa, pero en esa ocasión, él entró con ella al puesto de gasolina agachado ("eñangotao").[17] Aclaró que el empleado del puesto no veía a Durán Gutiérrez cuando le abrió la puerta para que entrara al negocio.[18] Especificó que Durán Gutiérrez estaba agachado ("eñangotao") frente a ella y a los cristales.[19] Testificó que, cuando el empleado salió de la "casita" para darle la pipa, Durán Gutiérrez le apuntó con una pistola y lo asaltó.[20] Describió el arma como una pistola color negra y mohosa.[21] Narró que Durán Gutiérrez entró junto al empleado a la "casita" donde se ubicaba la caja registradora, le tiró un bulto color negro a ella y le instruyó que recogiera todas las cajas de cigarrillos, así como todo lo que había allí.[22] Particularizó que Durán Gutiérrez la entró a la "casita", la insultó y le dijo que avanzara, por lo que procedió a recoger los cigarrillos y las cosas que él le ordenó.[23] Indicó que, mientras cogía las cajas de cigarrillos, Durán Gutiérrez se mantenía apuntándole con el arma de fuego al empleado y recolectando dinero de la caja registradora.[24] Admitió que no recordaba su vestimenta ni la de Durán Gutiérrez, pero indicó que ella llevaba puesta una mascarilla, mientras que Durán Gutiérrez tenía una máscara de goma con velcro para correr *four tracks* color negra, que le cubría parte de la cara, así como la parte de abajo de la nariz hacia atrás y desde la frente hacia atrás.[25]

Al examinar la fotografía admitida como Exhibit A13 del Ministerio Público, Rivera Padilla identificó el *Coco Rico* que había

---

[16] TPO, pág. 35, líneas 16-30; pág. 36, líneas 1-2.
[17] Íd., pág. 36, líneas 6-22.
[18] Íd., pág. 37, líneas 1-6.
[19] Íd., líneas 11-13.
[20] Íd., pág. 38, líneas 1-17.
[21] Íd., pág. 39, líneas 2-5.
[22] Íd., pág. 38, líneas 19-30; pág. 39, líneas 1, 11-13.
[23] Íd., pág. 39, líneas 19-28.
[24] Íd., pág. 40, líneas 1-9.
[25] Íd., líneas 13-27; pág. 41, líneas 1-13.

comprado y dejado encima del mostrador (*counter*).[26] En cuanto a la fotografía admitida como Exhibit A17 del Ministerio Público, identificó la caja registradora y testificó que Durán Gutiérrez le había ordenado al empleado del puesto de gasolina a que abriera la caja para coger el dinero que se encontraba dentro de ella.[27] Sobre la fotografía admitida como Exhibit A21 del Ministerio Público, indicó que observaba unas cámaras que Durán Gutiérrez había intentado sacar y no pudo.[28] Cuando le mostraron el Exhibit B2 del Ministerio Público, identificó a Olivo Crespo junto a ella en la fotografía del puesto de gasolina donde compró la pipa.[29] En cuanto al Exhibit B3 del Ministerio Público, describió que en la fotografía aparecía Durán Gutiérrez agachado ("eñangotao") frente a ella, quien, según indicó, se encontraba al lado de donde estaban las pipas en el puesto de Mayagüez.[30]

Rivera Padilla declaró que, posteriormente, salieron del puesto de gasolina, dejaron al empleado allí y se montaron en el vehículo marca *Tucson*.[31] Especificó que Olivo Crespo era el chofer, Durán Gutiérrez estaba sentado detrás de este y ella iba en el asiento delantero del pasajero.[32] Narró que, mientras guiaba, Olivo Crespo se perdió, razón por la cual Durán Gutiérrez se molestó y le quitó el volante a Olivo Crespo para conducir.[33] Detalló que, en el camino, Olivo Crespo dividió los cigarrillos de distintas marcas y a ella le tocó un bulto lleno de estos.[34] Testificó que llevaron a Olivo Crespo al residencial Batey en Vega Alta con varios cartones de cigarrillos y dinero que Durán Gutiérrez le dio.[35] Sin embargo, no sabía la

---

[26] TPO, pág. 42, líneas 16-30; pág. 43, líneas 1-5.
[27] Íd., pág. 43, líneas 24-29; pág. 44, líneas 1-2.
[28] Íd., pág. 44, líneas 24-30; pág. 45, líneas 14-17.
[29] Íd., pág. 52, líneas 8-19.
[30] Íd., líneas 25-30; pág. 53, líneas 1-12.
[31] Íd., pág. 45, líneas 24-30.
[32] Íd., pág. 46, líneas 7-17; pág. 47, líneas 7-10.
[33] Íd., pág. 47, líneas 23-24.
[34] Íd., líneas 20-21; pág. 48, líneas 6-14.
[35] Íd., pág. 48, líneas 15-29; pág. 49, líneas 7-19.

cantidad exacta.[36] Explicó que, luego de dejar a Olivo Crespo, de camino a la casa de esta, llamaron a alguien para que les llevara *crack* para fumar.[37] Añadió que le dejaron los otros cartones de cigarrillos a esa persona en el desvío de Corozal y luego se retiraron a su hogar.[38] Expuso que, una vez en su hogar, su hija le informó que se estaban llevando el vehículo de Durán Gutiérrez, el cual se encontraba estacionado al lado de su casa.[39] Abundó que se encontraban en su cuarto cuando ello ocurría, pero que no salió a ver quién se estaba llevando el automóvil, ya que Durán Gutiérrez le dijo que no saliera y que dejara que se llevaran el carro.[40]

A preguntas del Ministerio Público, y luego que se establecieran las bases para ello,[41] Rivera Padilla narró que, el 6 de octubre de 2020, el agente Israel Bisbal Torres (agente Bisbal Torres) la arrestó en su casa y la trasladó a Mayagüez.[42] Afirmó que, previo a ser entrevistada, el agente Bisbal Torres leyó los derechos de esta y, posteriormente, prestó una declaración jurada en el tribunal de forma libre y voluntaria, sin ser forzada ni bajo intimidación o efectos de sustancias o medicamentos que le afectaran su conocimiento.[43] Por otro lado, reconoció que tuvo una convicción previa por sustancias controladas diez (10) años antes, que tenía un registro de antecedentes penales con sus huellas dactilares y que había sido fichada anteriormente.[44]

En el turno de contrainterrogatorio, Rivera Padilla admitió que la noche de los hechos estaba fumando *crack* mientras iba de camino al puesto de gasolina.[45] A su vez, afirmó que había especificado que el negocio en cuestión se encontraba localizado en

---

[36] TPO, pág. 49, líneas 20-22.
[37] Íd., líneas 28-29.
[38] Íd., pág. 50, líneas 1-9.
[39] Íd., líneas 14-17.
[40] Íd., pág. 51, líneas 15-30.
[41] Íd., pág. 54, líneas 10-18.
[42] Íd., líneas 1-4, 21-27; pág. 55, línea 18; pág. 56, línea 9.
[43] Íd., pág. 56, líneas 1-5, 11-22; pág. 57, líneas 1-19.
[44] Íd., pág. 58, líneas 9-30; pág. 59, línea 1.
[45] Íd., pág. 62, líneas 15-18.

el pueblo de Mayagüez, no en Añasco.[46] No obstante, admitió que no recordaba los detalles del primer puesto de gasolina que visitaron.[47] Además, reiteró que Durán Gutiérrez utilizó una pistola color negra para cometer el asalto.[48] Por otro lado, negó haber hecho un acuerdo con el Ministerio Público para testificar en contra de Durán Gutiérrez.[49]

### Agente Víctor Montes Vélez

El próximo testigo fue el agente Víctor Montes Vélez (agente Montes Vélez), quien indicó tener veintiocho (28) años de experiencia y destacarse como técnico en la Sección Técnica de Grabaciones del Negociado de la Policía de Puerto Rico (Policía), en donde se dedica a extraer videografía de cámaras de seguridad, entre otros.[50] Declaró que el agente Bisbal Torres se comunicó con él y le solicitó la extracción de unos videos.[51] Testificó que en las imágenes extraídas del sistema de seguridad de la estación de gasolina Puma en Añasco, incluidas en un disco admitido como Exhibit K del Ministerio Público, podía observar en la cámara 3 (56:17) a un individuo (Durán Gutiérrez) que portaba una aparente arma en la mano derecha.[52] Describió que en la cámara 1 (55:17) pudo observar a un muchacho (empleado de la gasolinera) que se encontraba en el cuarto de testigos del tribunal, así como la sombra del individuo (Durán Gutiérrez) que observó en la cámara 3.[53]

El agente Montes Vélez detalló que en las imágenes proyectadas se podía ver la secuencia de sucesos en donde el individuo (Durán Gutiérrez) abrió una puerta y la señora (Rivera Padilla) lo estaba ayudando a echar aparentes cigarrillos en un bolso

---

[46] TPO, pág. 62, líneas 19-23.
[47] Íd., pág. 63, líneas 6-10.
[48] Íd., líneas 11-29; pág. 64, líneas 1-7.
[49] Íd., pág. 68, líneas 9-12.
[50] Íd., pág. 72, líneas 6-21; pág. 73, líneas 7-8.
[51] Íd., pág. 74, líneas 16-22.
[52] Íd., pág. 81, líneas 4-6, 27-30; pág. 82, líneas 9-18.
[53] Íd., pág. 83, líneas 3-9.

color negro.[54] Comentó que también aparecía en la imagen un individuo (empleado de la gasolinera) con las manos en alto.[55] Manifestó, además, que se observaba al caballero que tenía el arma de fuego (Durán Gutiérrez) arrancando la caja que contenía el dinero.[56]

En cuanto al Exhibit M del Ministerio Público, el agente Montes Vélez relató que en la cámara 8 observó la imagen de un vehículo color vino y un individuo que llevaba puesta una camisa color azul que le dio la vuelta a la parte frontal del automóvil.[57]

El Ministerio Público ilustró nuevamente las imágenes del Exhibit K y el agente Montes Vélez especificó que en la cámara 9 (51:57) observó un vehículo color vino y un individuo.[58] Asimismo, indicó que en la misma cámara (52:19) observó a un caballero con una dama que venían desde el vehículo descrito.[59] Narró que en imágenes posteriores de la misma cámara (52:59) se podía ver cuando el mismo individuo salió hacia el referido vehículo, mientras que la dama se montó en este poco después (53:20).[60] Añadió que en la misma cámara 9 (54:36) observó el momento en el que el vehículo salió de la estación de gasolina.[61] Manifestó que en dichas imágenes (55:24) también observó a un individuo con una aparente arma de fuego en su mano derecha.[62] Además, declaró que en la mencionada cámara 9 (57:05) pudo observar a una dama con un individuo que se montó en la parte trasera del vehículo descrito.[63]

Durante el contrainterrogatorio, el agente Montes Vélez afirmó que el arma observada en las imágenes podía ser un revólver color

---

[54] TPO, pág. 83, líneas 11-18.
[55] Íd., líneas 21-22.
[56] Íd., líneas 21-27.
[57] Íd., pág. 87, líneas 5-16, 29-30; pág. 88, líneas 13-16.
[58] Íd., pág. 94, líneas 10-28.
[59] Íd., pág. 95, líneas 1-4.
[60] Íd., líneas 7-11.
[61] Íd., líneas 15-23.
[62] Íd., pág. 96, líneas 1-21.
[63] Íd., líneas 29-30; pág. 97, líneas 1-2.

plata.[64] Asimismo, aseveró que, en casi todos los videos, aparecían dos (2) personas: una de tez blanca y con camisa azul, y otra era una mujer.[65]

### Wilfredo Aquino Rivera

El próximo en testificar fue Wilfredo Aquino Rivera (Aquino Rivera), quien, para el 16 de septiembre de 2020, era empleado en el puesto de gasolina Puma en Añasco.[66] Especificó que, en dicha fecha, se desempeñaba como cajero en el turno de 12:00 a.m. a 6:00 a.m.[67] Declaró que, alrededor de la 1:30 a.m. de ese día, una muchacha y un muchacho entraron a la estación de gasolina.[68] Describió el muchacho como alto, aproximadamente de seis pies con una o dos pulgadas de altura (6'1" – 6'2"), de tez trigueña, vestía camisa de manga corta y un pantalón, ambos color azul;[69] a la muchacha la describió como bajita, aproximadamente de cinco pies con dos a cuatro pulgadas (5'2" – 5'4") de estatura, pelo rubio ondulado, tez blanca "quemadita", vestía una camisa sin manga y un pantalón corto, ambos de color azul.[70]

Aquino Rivera narró que la muchacha, llamada Nylma, y su compañero se dirigieron al área de las neveras en la gasolinera, donde ella cogió una lata de *Coco Rico*, se dirigió hacia la cabina donde él se encontraba y pagó por el bien, mientras que el muchacho que la acompañaba salía de la estación.[71] Detalló que, posteriormente, Nylma le preguntó sobre una pipa de cristal ubicada en una vitrina en el área de afuera y le pidió tiempo para salir a buscar dinero en el carro.[72] Explicó que, cuando Nylma regresó a la estación, él salió de la cabina, abrió la vitrina, sacó la pipa y regresó

---

[64] TPO, pág. 98, líneas 20-25.
[65] Íd., pág. 99, líneas 10-16.
[66] Íd., pág. 103, líneas 3-8.
[67] Íd., líneas 17-22.
[68] Íd., pág. 104, líneas 1-2.
[69] Íd., líneas 2-4.
[70] Íd., líneas 5-8.
[71] Íd., líneas 15-21.
[72] Íd., líneas 22-27; pág. 105, líneas 8-9.

a la cabina.[73] Narró que, una vez encerrado en la cabina, Nylma le solicitó otra pipa, por lo que salió nuevamente de la cabina y, en ese momento, se levantó un hombre, distinto al primero, al cual describió como fuerte, con una estatura entre cinco pies con cuatro o cinco pulgadas (5'4" – 5'5"), tez trigueña, con su rostro cubierto por una máscara a través de la cual solamente se veía el área de los ojos y la parte de arriba de la cabeza, descrita como con calvicie y pelo "pegado".[74] Detalló que, cuando ese hombre se levantó, le apuntó con un revólver corto color negro, le agarró la camisa y lo empujó hacia adentro de la cabina.[75] Especificó que era un revólver porque tenía una masa al lado, donde se ponen las balas, a diferencia de otras armas que tenían peines.[76]

En cuanto a los hechos delictivos, Aquino Rivera declaró que, cuando el hombre lo empujó hacia el interior de la cabina, le ordenó que abriera la caja registradora y le pidió –insultándolo– todo el dinero que esta contenía.[77] Narró que dicho hombre mandó –a gritos– a Nylma a entrar a la cabina a coger todos los cigarrillos y lo que había en la cabina.[78] Expresó que, luego de entregar el dinero, el hombre le preguntó que si había más y, luego, haló la computadora que se encontraba debajo del mostrador y la tiró al suelo.[79] Testificó que el hombre le cuestionó que si estaba seguro de haberle entregado todo el dinero; le dijo que si le estaba mintiendo le iba a "dar un tiro".[80] Relató que, una vez le aseguró que le había dado todo el dinero, el hombre le ordenó abrir la puerta de la cabina, pero le enfatizó que no se atreviera a activar el imán de afuera de la puerta porque, si no obedecía, iba a ver lo que le pasaría.[81]

---

[73] TPO, pág. 105, líneas 9-11.
[74] Íd., líneas 10-23.
[75] Íd., líneas 26-28; pág. 106, líneas 3-4.
[76] Íd., pág. 105, líneas 29-30; pág. 106, líneas 1-2.
[77] Íd., pág. 106, líneas 5-9.
[78] Íd., líneas 9-11.
[79] Íd., líneas 11-15.
[80] Íd., líneas 17-18.
[81] Íd., líneas 19-25.

Aquino Rivera declaró que, después que Nylma y el hombre salieron de la estación, lo primero que hizo fue llamar al cuartel de la Policía de Añasco y, después, se comunicó con su patrono, quienes se personaron al lugar de los hechos.[82] Describió que los agentes de la Policía levantaron huellas dactilares y tomaron fotografías de la escena; entre otras cosas, fotografiaron el área donde se encontraba la lata de *Coco Rico* (encima del mostrador)[83] y donde estaba una cajetilla de cigarrillos *Newport,* de las cuales levantaron huellas dactilares.[84] Además, manifestó que, posteriormente, llegaron otros agentes para tomarle la declaración de lo sucedido y revisar las cámaras de seguridad del local, cuyas imágenes les sacaron copia y se las llevaron en un disco.[85]

En cuanto a la persona que tenía el arma de fuego, Aquino Rivera indicó que, al momento de los hechos, se encontraba a un pie de distancia.[86] Identificó a Durán Gutiérrez en corte abierta como el asaltante, comparando las características físicas antes descritas por él.[87] Asimismo, señaló que el vehículo en el que se encontraban las tres personas involucradas en el robo era un *Hyundai,* modelo *Tucson* del año 2006 o 2007, color vino, con cuatro puertas.[88] Atestó que pudo observar que la muchacha (Nylma), se montó en el área del pasajero del descrito automóvil, mientras que el hombre con el arma de fuego se ubicó detrás del chofer.[89] Abundó que dicho hombre estuvo forcejeando con la puerta del vehículo, al punto que rompió el mango (*handle*) de la puerta y lo dejó tirado en el área de una de las bombas de gasolina de la estación.[90]

En el contrainterrogatorio, Aquino Rivera aclaró que, en la

---

[82] TPO, pág. 106, líneas 26-30; pág. 107, líneas 1-3.
[83] Íd., pág. 109, líneas 15-18.
[84] Íd., pág. 107, líneas 3-15.
[85] Íd., pág. 109, líneas 19-28.
[86] Íd., pág. 107, líneas 21-30; pág. 108, líneas 5-18.
[87] Íd., pág. 108, líneas 1-5.
[88] Íd., pág. 109, líneas 1-7.
[89] Íd., líneas 8-12.
[90] Íd., líneas 12-14.

estación de gasolina, trabajaba detrás de una vitrina que estaba bloqueada con una puerta de seguridad.[91] Por otro lado, afirmó que se le hacía difícil identificar a la persona que lo asaltó porque esta tenía la cara cubierta al momento de los hechos.[92] A su vez, admitió que, antes de comenzar el proceso judicial, no había visto a Durán Gutiérrez.[93] Aseveró que podía confundirse en la identificación.[94] Luego de observar la regrabación del día de los hechos obtenida de las cámaras de seguridad de la estación de gasolina, admitido como Exhibit K del Ministerio Público, manifestó que el hombre que tenía el arma de fuego se montó en el lado del pasajero, contrario a lo indicado por él en su declaración jurada.[95] De otro lado, mencionó que los agentes de la Policía no levantaron huellas dactilares de Durán Gutiérrez en la escena.[96]

### Agente Israel Bisbal Torres

El último testimonio presentado durante el juicio fue el del agente Israel Bisbal Torres (agente Bisbal Torres), quien indicó tener veinticinco (25) años de experiencia y estar adscrito a la División de Robos de la Policía de Mayagüez por tres (3) años.[97] Declaró que, el 16 de septiembre de 2020, le asignaron la *Querella* del caso de autos, por lo que se personó al lugar de los hechos y, a las nueve de la mañana, entrevistó a Aquino Rivera.[98] Indicó que Aquino Rivera le había detallado que, durante el turno de la madrugada, llegaron dos personas en un vehículo marca *Hyundai*, modelo *Tucson*, a la estación *Puma*.[99] Según le describió el mencionado testigo, una de las personas que se bajó del auto era una mujer de tez blanca, pelo ondulado color un "poco rubio", mientras que la otra persona era un

---

[91] TPO, pág. 110, líneas 26-29.
[92] Íd., pág. 115, líneas 18-24.
[93] Íd., líneas 25-28.
[94] Íd., pág. 116, líneas 9-12.
[95] Íd., pág. 117, líneas 24-29.
[96] Íd., pág. 118, líneas 1-5.
[97] Íd., pág. 122, líneas 1-6, 11-15.
[98] Íd., pág. 123, líneas 16-28; pág. 125, líneas 20-25.
[99] Íd., pág. 124, líneas 1-3.

hombre delgado con más de seis pies (6') de altura.[100] Añadió que Aquino Rivera le expresó durante la entrevista que dichas personas compraron un refresco marca *Coco Rico* y una pipa, pero que luego la mujer le solicitó otra pipa.[101] Conforme a lo expresado por el referido testigo, añadió que cuando Aquino Rivera salió del área donde se encontraba la caja registradora, apareció un individuo de tez trigueña, con una estatura más baja que la suya, el pelo pegado y una calvicie en la parte superior de la cabeza, y lo agarró por la camisa, le apuntó con un revólver y lo empujó hacia el área de la caja registradora.[102] Aquino Rivera le narró al agente Bisbal Torres que la mujer previamente descrita también entró junto a ellos con un bulto en donde guardó los cigarrillos que sacó del área de la caja registradora.[103] También le manifestó que el referido individuo sacó todo el dinero que había en la caja registradora, mientras permanecía amenazándolo con un revólver color negro, y que, posteriormente, se marchó del lugar junto a la mencionada mujer.[104] El agente Bisbal Torres, además, declaró que, con el fin de corroborar la versión de Aquino Rivera, se comunicó con la Unidad de Grabaciones Técnicas de la Policía para que extrajeran los videos grabados por las cámaras de seguridad que se encontraban en el establecimiento donde ocurrieron los hechos.[105]

Por otro lado, el agente Bisbal Torres testificó que, el 16 de septiembre de 2020, recibió información sobre una víctima de robo en la gasolinera *Top Fuel* en Añasco, que esta estuvo en el hospital recibiendo atención médica, pero que no quiso radicar una querella sobre lo sucedido.[106] Explicó que había llegado al mencionado puesto de gasolina para revisar lo grabado por las cámaras de

---

[100] TPO, pág. 124, líneas 1-3.
[101] Íd., líneas 6-12.
[102] Íd., líneas 12-17, 19-24.
[103] Íd., líneas 17-19.
[104] Íd., líneas 26-30; pág. 125, línea 1.
[105] Íd., pág. 126, líneas 17-19.
[106] Íd., pág. 127, líneas 16-23.

seguridad del lugar y, en un video de lo ocurrido en horas de la madrugada, observó un vehículo marca *Hyundai*, modelo *Tucson* del 2010, color vino, similar al que aparecía en los videos de los hechos que nos ocupan, llegar a la estación.[107] Especificó que del automóvil se bajó una mujer, así como un hombre delgado y alto, con las mismas descripciones físicas y vestimenta que le dieron de los asaltantes en el robo perpetrado en el garaje *Puma*, y entraron al establecimiento *Top Fuel*.[108] Señaló, además, que también vio a un individuo de altura baja y tez trigueña salir del carro descrito.[109] Sobre el vehículo observado en el video, enfatizó que logró obtener la tablilla de este, cuyo alfanumérico era GQL-196.[110] Particularizó que había verificado dicha información en el sistema DAVID y encontró que el vehículo con dicha tablilla estaba registrado a nombre de José M. Durán, con dirección en el Barrio Galateo, Parcela 42, en Toa Alta.[111]  Mencionó que, al continuar con su investigación, el mismo día, la División de Robos de la Policía en Vega Alta le indicó que el vehículo en cuestión se encontraba en el Sector Cuba Libre en Corozal.[112] Testificó que, luego de varias gestiones, una grúa de la Comandancia de la Policía en Mayagüez selló y ocupó el referido automóvil como parte de la investigación del robo en la estación *Puma*.[113]

El agente Bisbal Torres relató que, el 17 de septiembre de 2020, fue a la Parcela 22 del Barrio Galateo en Toa Alta y allí entrevistó a Judith V. Gutiérrez Rivera (Gutiérrez Rivera), quien le señaló que José M. Durán era su difunto esposo y a nombre de quien estaba el vehículo marca *Hyundai*, modelo *Tucson*, color vino.[114]

---

[107] TPO, pág. 128, líneas 12-18; pág. 129, líneas 6-18.
[108] Íd., líneas 19-23; pág. 129, líneas 19-25.
[109] Íd., líneas 26-27.
[110] Íd., pág. 129, líneas 29-30; pág. 130, líneas 1-7.
[111] Íd., pág. 130, líneas 4-7.
[112] Íd., pág. 136, líneas 24-30; pág. 137, líneas 1-3.
[113] Íd., pág. 137, líneas 9-14.
[114] Íd., líneas 15-26; pág. 141, líneas 15-20.

Explicó que, con la información provista, continuó su investigación mediante la cual concluyó que Durán Gutiérrez era el hijo de Gutiérrez Rivera y era quien poseía el descrito automóvil.[115] Comentó que buscó a Durán Gutiérrez en el sistema CRADIC para ver cómo era físicamente y corroborar las descripciones que había recopilado durante su investigación.[116] Abundó que, en dicho sistema, también descubrió los antecedentes penales de Durán Gutiérrez, entre los que se encontraban convicciones por robo, por lo que mantuvo a dicha parte como persona de interés en la investigación.[117] Indicó que, posteriormente, supo que Durán Gutiérrez era pareja de Rivera Padilla y vivía con ella en el Barrio Cuba Libre en Corozal.[118]

Sobre Rivera Padilla, el agente Bisbal Torres declaró que las huellas levantadas en el lugar de los hechos pertenecían a ella y que, el 6 de octubre de 2020, acompañado por otros agentes, acudió a la residencia de esta en Corozal, donde se había ocupado el vehículo en cuestión.[119] Según narró, fue con Rivera Padilla al Cuartel de Corozal, le leyó las advertencias legales correspondientes, le explicó las razones por las cuales estaban allí y le informó sobre la identificación positiva de las referidas huellas digitales.[120] Testificó que, en ese momento, Rivera Padilla aceptó su participación en el robo en la estación *Puma*, por lo que procedió a detener la entrevista, arrestar a Rivera Padilla y trasladarla a la Comandancia de Mayagüez, donde se le realizó una entrevista formal y se le leyeron nuevamente las advertencias legales.[121] Atestó que, durante la mencionada entrevista, le enseñó a Rivera Padilla la certificación de la identificación positiva de su huella dactilar levantada en la

---

[115] TPO, pág. 138, líneas 7-13.
[116] Íd., líneas 15-18; pág. 146, líneas 21-26.
[117] Íd., pág. 142, líneas 29-30; pág. 143, líneas 1-2; pág. 147, líneas 14-17.
[118] Íd., líneas 1-24.
[119] Íd., pág. 147, líneas 24-29; pág. 148, líneas 1-30; pág. 149, líneas 1-5.
[120] Íd., pág. 149, líneas 6-14.
[121] Íd., líneas 14-22.

escena, su *mug shot* y tres (3) fotografías adquiridas de los videos de las cámaras de seguridad de la mencionada gasolinera (Exhibits Núm. B1, B2 y B3 del Ministerio Público).[122] En cuanto a las fotografías admitidas como Exhibit B1 y B2 del Ministerio Público, puntualizó que Rivera Padilla identificó a Olivo Crespo, a quien esta conocía por ser su vecino previo durante ocho (8) años.[123] Sobre la fotografía admitida como Exhibit Núm. B3 del Ministerio Público, manifestó que Rivera Padilla había identificado a la persona que aparecía agachada en la imagen como Durán Gutiérrez, con quien compartía una relación consensual durante ocho (8) meses.[124] De igual forma, el agente Bisbal Torres identificó a Durán Gutiérrez en sala.[125] A su vez, afirmó que la versión de los hechos descrita por Rivera Padilla era la misma que reflejaban los videos obtenidos de las cámaras de seguridad de la estación *Puma,* aun cuando dicha testigo no había visto esa prueba.[126]

Por otro lado, el agente Bisbal Torres declaró que, el 23 de septiembre de 2020, entrevistó a Olivo Crespo en la División de Robo de la Policía en Arecibo.[127] Destacó que, al ver a Olivo Crespo, automáticamente lo clasificó como sospecho del robo en cuestión, debido a sus características físicas, por lo que procedió a leerle las advertencias legales correspondientes y a informarle sobre la investigación en curso y su posible participación.[128]

Por su parte, la defensa objetó oportunamente el testimonio del agente Bisbal Torres sobre lo declarado por Olivo Crespo, por entender que constituía prueba de referencia, toda vez que no era testigo del caso.[129] En desacuerdo, el Ministerio Público argumentó

---

[122] TPO, pág. 149, líneas 22-25; pág. 150, líneas 7-12.
[123] Íd., pág. 150, líneas 13-30.
[124] Íd., pág. 151, líneas 1-9.
[125] Íd., pág. 153, líneas 3-8.
[126] Íd., pág. 151, líneas 16-29; pág. 152, líneas 1-3.
[127] Íd., pág. 153, líneas 17-19.
[128] Íd., líneas 19-27; pág. 155, líneas 8-15.
[129] Íd., pág. 155, líneas 17-20.

que, conforme a la Regla 803(e) de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 803(e), se trataba de una prueba de referencia admisible porque Olivo Crespo había realizado una alegación de culpabilidad sobre los hechos en cuestión y había declarado anteriormente sobre el coimputado (Durán Gutiérrez) como parte de la investigación del agente Bisbal Torres.[130]

Evaluadas las posturas de las partes, el juzgador de los hechos expresó que, aunque lo anterior podía considerarse como prueba de referencia, bajo la Regla 803 de Evidencia de Puerto Rico, *supra*, no se considera como tal por ser una declaración de una persona que actuó como conspiradora de la parte contra quien declara, hecha en el trascurso de la conspiración y para lograr su objetivo.[131] Determinó que, en la medida en que las acusaciones presentadas en el caso de autos se imputaban unos hechos en concierto y común acuerdo con Olivo Crespo, ello estaba contemplado en la excepción establecida en el inciso (e) de la Regla 803 de Evidencia de Puerto Rico, *supra*.[132] En vista de ello, resolvió que lo declarado por Olivo Crespo no era prueba de referencia, por lo que el agente Bisbal Torres podía testificar sobre esas manifestaciones.[133]

Superado lo anterior, el agente Bisbal Torres detalló lo siguiente sobre la entrevista que le realizó a Olivo Crespo:

> Ok, [é]l tan pronto se le...le present[ó] las fotos[,] [é]l pues hace un gesto[,] baja la cabeza, [é]l admite y dice que s[í][,] que [é]l fue eh...que [é]l es la persona que estuvo, que, que está ahí en esa foto eh...yo le pregunto si [é]l conoce a esas otras 2 personas y [é]l me dice que s[í][,] que [é]l los conoce, [é]l conoce a la joven por "rubia" que es Nylma y que conocía a Giovanni por "negro" por, por ser, por el nombre de, de "negro" eh...como parte de, de la entrevista yo le digo cu[á]nto tiempo hacía que, que conocía a Nylma, [é]l me dice que varios años hace 7, 8 años eh...y que a, a "negro" a Giovanni pues lo conocía hace varios mese[s] ya porque pues hab[í]a compartido con, con , con Nylma. Que los

---

[130] TPO, pág. 155, líneas 21-27.
[131] Íd., pág. 156, líneas 8-12.
[132] Íd., líneas 12-18.
[133] Íd., líneas 18-19.

hechos que ocurrieron allí eh...[é]l se encontraba esa noche en el residencial Las Violetas en Vega Alta y que lleg[ó] Nylma con Giovanni en la guagua Tuc...en una guagua Tucson color vino y que le dijeron que si quería fumar, que si quería fumar[,] ya que el est[á] en vicios de crack[,] y que se fuera con ellos que iban a buscar chavos por ahí para fumar. Eh...[é]l dice que se fueron por la carretera que llegaron a, a una primera bomba eh...que en esa bomba [é]l, él se bajó, se bajó Nylma eh...que en una movieron el vehículo más para al frente y que Giovanni se baj[ó] corriendo eh...y[,] de momento[,] lleg[ó] nuevamente corriendo[,] otra vez se montaron en la gua...y se fueron, que siguieron guiando la guagua Tucson y llegaron hasta otra gasolinera. Que en la otra gasolinera eh...hicieron lo mismo[,] él se bajó, se bajó Nylma y que despu[é]s que, que, que Nylma se bajó, él se montó en la guagua, él se qued[ó] en la guagua que Giovanni se bajó y que de ahí ellos salieron se...él se quedó en el vehículo y que Giovanni y Nylma salieron, Nylma se mont[ó] en la guagua y Giovanni salió corriendo y lo cogieron un poquito más adelante en la misma carretera de la gasolinera. Que se montaron y se fueron hacia el pueblo de, de, de Toa...de Toa Alta. Que ellos siguieron[,] que en ese momento se repartieron...se dieron dinero eh...le dieron un dinero a él, unos cigarrillos y que lo dejaron en el residencial El Batey, entiendo eso era en Vega Ba...en Vega Alta no me acuer... [...] ...Eh...y que de ahí ellos se fueron, pero...[134]

Luego de la precitada narración, el agente Bisbal Torres testificó que, después de admitir los hechos en controversia, Olivo Crespo le expresó que no estaría dispuesto a declarar en contra de otra persona en un proceso judicial.[135]

Durante el contrainterrogatorio, el agente Bisbal Torres afirmó que, aunque no pudo identificar el rostro de la persona asaltante que aparecía enmascarada en los videos extraídos de las cámaras de seguridad de la estación *Puma*, lo podía identificar físicamente.[136] Además, aseveró que, en las imágenes que vio en los videos recuperados del robo ocurrido en la gasolinera *Top Fuel*, tampoco pudo identificar el rostro de la persona asaltante, pero sí pudo identificar que era la misma persona por la vestimenta que llevaba puesta y las características físicas.[137] Por otro lado, admitió que cuando ocuparon el vehículo marca *Hyundai*, modelo *Tucson*, frente

---

[134] TPO, pág. 156, líneas 24-30; pág. 157, líneas 1-25.
[135] Íd., pág. 160, líneas 28-30; pág. 161, líneas 1-4.
[136] Íd., pág. 164, líneas 3-17.
[137] Íd., pág. 168, líneas 13-23; pág. 169, líneas 2-5.

a la casa de Rivera Padilla, no la entrevistaron en ese momento.[138] A su vez, explicó que, aunque previo a la radicación de los cargos no había entrevistado a Durán Gutiérrez, ni fue a la institución penal donde este se encontraba para corroborar sus características físicas, había confirmado todos los datos y características pertinentes en el sistema CRADIC; detalle que reiteró en el redirecto.[139]

En el redirecto, el agente Bisbal Torres detalló que la máscara que tenía la persona asaltante era una con estilo de "correr motora", que únicamente cubría el área de la nariz, boca y parte de las orejas y cabeza, pero que el área de los ojos estaba al descubierto y pudo observar la tez trigueña, el recorte pegado, así como la calvicie de la referida persona.[140] Enfatizó que pudo, además, observar el físico, la estatura y la vestimenta que traía puesta la persona enmascarada.[141]

Durante el recontrainterrogatorio, el agente Bisbal Torres declaró que en el sistema CRADIC aparecía que la estatura de Durán Gutiérrez era cinco pies con siete pulgadas (5'7"), mientras que en sus anotaciones de la entrevista realizada a Aquino Rivera surgía que este describió al asaltante con una estatura de cinco pies y cuatro pulgadas (5'4").[142] Sin embargo, señaló que, a través de su investigación, había corroborado que Durán Gutiérrez fue quien cometió el robo en cuestión.[143] Negó que los testimonios ofrecidos por Olivo Crespo y Rivera Padilla fueran de dudosa reputación.[144] De otro lado, reconoció que, aunque no pudo entrevistar a Durán Gutiérrez como parte de su investigación, había realizado las gestiones conducentes a ello, pero no se logró.[145]

---

[138] TPO, pág. 171, líneas 1-15.
[139] Íd., pág. 175, líneas 14-30; pág. 176, líneas 1-2, 27-30; pág. 177, líneas 1-6.
[140] Íd., pág. 176, líneas 8-18.
[141] Íd., líneas 19-24.
[142] Íd., pág. 178, líneas 10-29; pág. 179, líneas 1-7.
[143] Íd., pág. 179, líneas 14-22.
[144] Íd., líneas 23-30.
[145] Íd., pág. 180, líneas 1-7.

Después de terminados los turnos de las partes, el juzgador de los hechos le realizó varias preguntas al agente Bisbal Torres.[146] A preguntas del foro sentenciador, el agente Bisbal Torres detalló que Rivera Padilla se encontraba consciente y "bien" durante su entrevista, a la cual acudió sin acompañantes.[147] Abundó que Rivera Padilla estaba cuerda, razonable y entendía la razón por la cual se le entrevistaba.[148] Manifestó que Rivera Padilla se mostró segura al identificar a Olivo Crespo y a Durán Gutiérrez, además de haber detallado el tiempo y las circunstancias en las que conocía a ambos individuos.[149] Expresó que en las entrevistas realizadas a Rivera Padilla no hubo ninguna contradicción o discrepancia en las declaraciones de esta.[150] Culminadas las preguntas al referido testigo, el Ministerio Público sometió el caso y las partes argumentaron sus posturas.[151]

Aquilatada la prueba desfilada ante sí, el Tribunal de Primera Instancia declaró culpable a Durán Gutiérrez. Posteriormente, el foro primario lo sentenció a un total de cincuenta y tres (53) años y diez (10) meses de cárcel, a cumplirse de forma consecutiva, por todos los cargos que pesaban en su contra.[152] A su vez, el foro *a quo* le impuso el pago de una pena especial a tenor con la *Ley para la Imposición de la Pena Especial del Código Penal de Puerto Rico*, Ley Núm. 34-2021, 4 LPRA sec. 1661 *et seq.*

Inconforme, el 17 de marzo de 2022, recibido en la Secretaría de este Tribunal el 23 de agosto del mismo año, la parte apelante acudió, por derecho propio, *in forma pauperis*, ante esta Curia mediante el recurso de epígrafe y señaló los siguientes errores:

---

[146] TPO, págs. 182-185.
[147] Íd., pág. 182, líneas 1-8.
[148] Íd., líneas 13-16.
[149] Íd., líneas 17-21.
[150] Íd., pág. 183, líneas 7-11.
[151] Íd., pág. 186, líneas 26-28.
[152] Véase, *Sentencias* en los autos originales de los casos ISCR202100150, ISCR202100151, ISCR202100152, I1CR202000254 y I1CR202000255.

A. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ENCONTRARME CULPABLE EN VIRTUD DE UNA PRUEBA QUE NO DERROTÓ LA PRESUNCIÓN DE INOCENCIA Y MUCHO MENOS ESTABLECIÓ LA CUL20PABILIDAD FUERA DE DUDA RAZONABLE.

B. ERRORES ADICIONALES DE DERECHO TRAS LA DEBIDA EVALUACIÓN DEL EXPEDIENTE DE INSTANCIA Y LA TOTALIDAD DE LA PRUEBA DE INSTANCIA Y LA TOTALIDAD DE LA PRUEBA ORAL DESFILADA DURANTE EL JUICIO EN SU FONDO, AL AMPARO DE HENDERSON V. US, 133 S[.] CT. 1121 (2013) Y PUEBLO V. SOTO RÍOS, 95 DPR 483 (1967).

1) ERRÓ EL TPI AL DICTAR SENTENCIA POR EL ART. 6.14(A) DE LA LEY DE ARMAS CUANDO LA ACUSACIÓN NO IMPUTA DELITO Y NO TENÍA JURISDICCIÓN PARA ENJUICIAR AL APELANTE POR ESTE DELITO, PROCEDIENDO LA REVOCACIÓN DE LA SENTENCIA AL AMPARO DEL DEBIDO PROCESO DE LEY.

2) ERRÓ EL TPI AL IMPONER EL PAGO DE LA PENA ESPECIAL EN EL CASO DE AUTOS CUANDO HAY UNA DETERMINACIÓN DE INDIGENCIA DEL APELANTE DESDE EL INICIO DEL CASO.

3) ERRÓ EL HONORABLE JUEZ DE INSTANCIA AL ADMITIR PRUEBA DE REFERENCIA A PESAR DE LA OPORTUNA OBJECIÓN DE LA DEFENSA CUANDO EL TESTIGO NO ESTUVO DISPONIBLE PARA CONFRONTARLO EN VIOLACIÓN A ESTE DERECHO Y AL DEBIDO PROCESO DE LEY.

Tras varios incidentes procesales, el 22 de mayo de 2024, la parte apelante, representada por la Sociedad para Asistencia Legal de Puerto Rico, presentó el escrito intitulado *Alegato del Apelante*. Por su parte, el 8 de julio de 2024, el Pueblo de Puerto Rico, representado por la Oficina del Procurador General de Puerto Rico, compareció mediante *Alegato de el [sic] Pueblo*.

Con el beneficio de la comparecencia de las partes, así como la transcripción estipulada de la prueba oral, los autos originales y

la prueba documental y fotográfica, nos disponemos a resolver el recurso que nos ocupa.

**II**

**A**

En nuestro ordenamiento jurídico, a toda persona acusada de delito le cobija una presunción de inocencia. La Sección 11 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico decreta que: "[e]n todos los procesos criminales, [la persona acusada] disfrutará del derecho a un juicio rápido y público, a ser notificad[a] de la naturaleza y causa de la acusación recibiendo copia de la misma, a carearse con los testigos de cargo, a obtener la comparecencia compulsoria de testigos a su favor, a tener asistencia de abogado [o abogada] y a gozar de la presunción de inocencia". Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. Es por ello que, el Estado es quien tiene el peso de la prueba. *Pueblo v. Negrón Ramírez*, 213 DPR 895 (2024); *Pueblo v. Toro Martínez*, 200 DPR 834 (2018); *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002).

En respuesta a tal decreto, en los casos penales permea el principio fundamental de que se deben probar más allá de duda razonable todos los elementos del delito, su conexión con la persona acusada y la intención o negligencia criminal de esta. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Toro Martínez*, supra.

Para determinar que la prueba controvierte la presunción de inocencia, esta debe ser suficiente y satisfactoria; es decir, que produzca certeza o convicción moral en el juzgador. *Pueblo v. Resto Laureano,* supra, pág. 967, citando a *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 552 (1974). Tal exigencia no significa que el Ministerio Público deba presentar evidencia dirigida a establecer la culpabilidad de la persona acusada con certeza matemática. *Pueblo v. Negrón Ramírez*, supra. Lo que se requiere es prueba suficiente, que produzca certeza o convicción moral en una

conciencia exenta de preocupación o en un ánimo no prevenido. *Íd.*; *Pueblo v. García Colón I,* 182 DPR 129, 174-175 (2011).

En ese sentido, la prueba presentada por el Ministerio Público debe probar todos los elementos del delito y la conexión de la persona imputada con el referido delito. *Pueblo v. Negrón Ramírez,* supra. Por tal razón, la carencia de prueba sobre alguno de los elementos del delito implicaría el incumplimiento por parte del Estado con su carga probatoria y supondría la absolución de la persona acusada respecto al delito imputado. *Íd.*

Por su parte, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, establece que la persona acusada se presumirá inocente. Además, dispone que, mientras no se probare lo contrario, y en caso de existir duda razonable acerca de su culpabilidad, esta será absuelta. Hay duda razonable cuando el juzgador siente insatisfacción con la prueba, una vez sopesados todos los elementos involucrados en el caso. *Pueblo v. Casillas, Torres,* 190 DPR 398 (2014).

Inicialmente, le corresponde al juzgador de hechos determinar si se satisfizo el estándar probatorio correspondiente y si, en su consecuencia, se probó la culpabilidad de la persona acusada más allá de duda razonable. *Pueblo v. Negrón Ramírez,* supra. Es decir, quien vendrá llamado a evaluar y aquilatar la evidencia presentada ante sí para determinar cuáles hechos han quedado probados o establecidos es el juzgador de los hechos. *Pueblo v. Toro Martínez,* supra, pág. 858; *Pueblo v. Acevedo Estrada,* 150 DPR 84, 98 (2000); *Pueblo v. Torres Rivera,* 137 DPR 630, 641 (1994).

En cuanto a la apreciación imparcial de la prueba, resulta harto conocido que la evaluación que de esta realicen los juzgadores de hechos merece respeto y confiabilidad. *Pueblo v. Resto Laureano,* 206 DPR 963, 968 (2021) (sentencia). Por ello, las determinaciones de hechos probados que haya hecho el juzgador primario no se

deben descartar arbitrariamente, a menos que de la prueba admitida surja que no hay base suficiente para apoyarlas. *Pueblo v. Acevedo Estrada*, supra, pág. 99. En ese sentido, "nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los juzgadores de primera instancia en cuanto a la prueba testifical que se presenta ante ellos". *Pueblo v. Arlequín Vélez*, 204 DPR 117, 146-147 (2020), citando a *Pueblo v. Toro Martínez*, supra, pág. 857. Dicha deferencia emana del hecho de que los juzgadores de instancia se encuentran en una mejor posición para evaluar, aquilatar y adjudicar la prueba presentada ante ellos. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Toro Martínez*, supra, págs. 857-858; *Pueblo v. García Colón I*, supra, pág. 165; *Pueblo v. Bonilla Romero*, 120 DPR 92, 111 (1987). Lo anterior cobra mayor vigencia cuando se trata de la prueba testifical (oral) desfilada en el juicio. *Íd.* Ello debido a que son los juzgadores de hechos los que pueden oír y apreciar la forma de declarar de los testigos, así como su comportamiento. *Íd.*; *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62-63 (1991).

Por tanto, en las causas de acción de naturaleza criminal, la deferencia ante la apreciación de los foros primarios solo cederá si ha mediado prejuicio, parcialidad o pasión, o si la prueba no concuerda con la realidad fáctica, resultare increíble o imposible. *Pueblo v. Negrón Ramírez*, supra; *Pueblo v. Santiago et al.*, 176 DPR 133, 147-148 (2009).

Si bien la determinación de si se probó la culpabilidad de la persona acusada más allá de duda razonable es un asunto de hecho y derecho revisable en apelación, nuestro esquema probatorio está revestido de deferencia a las determinaciones que los juzgadores de primera instancia hacen sobre la prueba testifical, ya sea un juez, una jueza o un panel de jurados. Esto, debido a que dicho foro está en mejor posición de aquilatarla. *Pueblo v. Rodríguez Pagán,* 182

DPR 239 (2011); *Pueblo v. Irizarry,* supra, pág. 788; *Pueblo v. Rivero, Lugo y Almodóvar,* 121 DPR 454 (1988).

Cónsono con lo anterior, el Tribunal Supremo de Puerto Rico ha manifestado que la deferencia debida a los foros de instancia se extiende tanto a la adjudicación de credibilidad que estos realizan sobre los testigos que declaran ante sí, como a las determinaciones de hechos realizadas por el juzgador. *Pueblo v. Negrón Ramírez,* supra; *Pueblo v. Toro Martínez,* supra, pág. 858; *Trinidad v. Chade,* 153 DPR 280, 291 (2001); *Pueblo v. Torres Rivera,* supra, págs. 640-641.

Cuando coinciden asuntos sobre la suficiencia de la prueba y la deferencia en cuanto a la prueba testifical, debe evaluarse si la determinación de credibilidad del juzgador de hechos rebasó los límites de la sana discreción judicial. *Pueblo v. Resto Laureano,* supra, pág. 969. Al entrelazar estos principios, se ha establecido que, aunque las determinaciones de hecho queden sostenidas por la prueba desfilada, podría revocarse un fallo condenatorio si de un análisis integral de la prueba los foros revisores no quedan convencidos. *Pueblo v. Carrasquillo Carrasquillo,* supra, pág. 551.

**B**

La identificación de la persona acusada es una de las etapas más esenciales o críticas en el procedimiento criminal, pues no puede haber una convicción sin prueba que conecte o señale a una persona imputada de delito, fuera de duda razonable, como la responsable de los hechos delictivos que se le imputan. Ello es así porque si no se garantiza debidamente la forma de identificar a la persona que es acusada de la comisión de un crimen, ella no puede tener un juicio justo e imparcial, tal como lo exige el Artículo II, Sección 11, de la Constitución del Estado Libre Asociado de Puerto Rico. *Pueblo v. Gómez Incera,* 97 DPR 249, 252 (1969); *Pueblo v. Rodríguez Maysonet,* 119 DPR 302, 309 (1987). Incluso, constituye

una violación al debido proceso de ley. *Pueblo v. Hernández González*, 175 DPR 274, 289 (2009).

Se ha reconocido que los mayores extravíos en la administración de la justicia lo ocasionan los errores en la identificación de las personas acusadas debido a que la evidencia de identificación es la prueba de opinión por excelencia. Por ello, nuestro Tribunal Supremo adoptó la doctrina que establece la supresión de toda prueba de identificación fruto de un procedimiento tan viciado que, como cuestión de derecho, haga constitucionalmente inadmisible la identificación por violar el debido proceso de ley. *Pueblo v. Gómez Incera*, supra, págs. 251-252, 257. Desde entonces, la determinación de si se ha violado este derecho depende de la totalidad de las circunstancias que rodearon tal procedimiento.

La confiabilidad de la identificación que hace el testigo o la propia víctima del delito, sin la intervención de los funcionarios del orden público, encuentra su apoyo en la razón por la que se estatuyó el procedimiento que gobierna la celebración de una rueda de detenidos.[153] Dicho procedimiento se estableció con el objetivo principal de desalentar que los funcionarios del Estado utilicen métodos menos confiables, pues se teme que, en un caso en particular, esos funcionarios interfieran indebidamente con los testigos de los hechos sugiriéndoles la persona que deben identificar. *Pueblo v. Rodríguez Maysonet*, supra, pág. 314.

La celebración de un procedimiento alterno de identificación, específicamente la rueda de detenidos, "es un instrumento en

---

[153] En particular, la Regla 252.1 de Procedimiento Criminal, 34 LPRA Ap. II, R. 252.1, establece el procedimiento para someter a una persona sospechosa de delito a una rueda de detenidos. Por su parte, la Regla 252.2 del mismo cuerpo de reglas, 34 LPRA Ap. II, R. 252.2, establece el procedimiento a seguir para la identificación por fotos de la posible persona autora de un acto delictivo y las circunstancias en que ese método de identificación puede utilizarse. En nuestro ordenamiento también se reconoce la identificación por medio de la voz.

reserva cuando la confusión, el correr del tiempo, la difícil percepción, el recuerdo tenue, la inseguridad del testigo, o cualquier otro factor en evaluación lógica enerve la razonable certeza exigida de quien señala [a la persona autora] del delito". *Pueblo v. Rodríguez Maysonet*, supra, pág. 314, citando a *Pueblo v. Suárez Sánchez*, 103 DPR 11, 19 (1974); *Pueblo v. Hernández González*, supra, pág. 293. Esa expresión necesariamente alude a que el procedimiento de identificación que realiza la víctima o testigo del delito, además de ser el que nuestra jurisprudencia cataloga como el más confiable, es el más cotidiano o usual. Por otro lado, cabe resaltar que, si la víctima o testigo conocía previamente a la persona acusada, no es necesario observar un procedimiento alterno de identificación. *Pueblo v. Falú Martínez*, 116 DPR 828, 840-841 (1986).

Según ha enfatizado nuestro Tribunal Supremo, lo importante no es el método que se utilice para la identificación de la persona acusada, sino que la identificación se haya hecho de forma libre, espontánea y confiable. *Pueblo v. Hernández González*, supra, pág. 292. Para concluir que la identificación satisface ese *test*, es necesario efectuar un análisis contextualizado de la totalidad de las circunstancias, siguiendo los siguientes criterios: (1) la oportunidad que tuvo la persona testigo de ver al criminal durante la comisión del delito; (2) el grado de atención de la persona testigo; (3) la precisión de la descripción de la parte perpetradora que haga la persona testigo; (4) el grado de certeza que demuestre la persona testigo durante la rueda de detenidos, y (5) el lapso de tiempo que ha transcurrido entre el crimen y la identificación. *Íd.*, págs. 291-292.

## C

El Artículo 177 del Código Penal de 2012, 33 LPRA sec. 5243, tipifica el delito de amenaza de la siguiente manera:

Incurrirá en delito menos grave, toda persona que amenace a una o varias personas con causar un daño determinado a su persona o su familia, integridad corporal, derechos, honor o patrimonio.

La persona cometerá delito grave y se impondrá pena de reclusión por un término fijo de tres (3) años si dicha amenaza provoca la evacuación de un edificio, lugar de reunión, o facilidad de transporte público.

La profesora Dora Nevares Muñiz define la *amenaza* como aquella "expresión intencional de que se llevará a cabo determinada intención delictiva o daño contra otra persona". D. Nevares Muñiz, *Código Penal de Puerto Rico Comentado por Dora Nevares Muñiz*, Edición 2012, San Juan, Instituto para el Desarrollo del Derecho Inc., 2012, pág. 257. En particular, los elementos del delito de amenaza son los siguientes: (1) una manifestación expresa de voluntad, verbal o escrita, de causar un daño determinado a alguna persona determinada o a su familia (2) y una apariencia de peligro e intranquilidad para la persona destinataria de la amenaza o quien la escucha. *Íd.*

En cuanto a la consumación del delito, la citada autora opina que este se consuma cuando se profiere la amenaza y no cuando se realiza el delito con el cual se amenaza. Nevares Muñiz, *op. cit.* En lo que respecta al daño que se amenaza con causar, debemos mencionar que el mismo tiene que ser específico y determinado. *Íd.*, pág. 258. Asimismo, "si la persona no tiene capacidad para infligir el daño, no estamos propiamente ante una amenaza[,] pues el destinatario de la misma no va a sentirse amenazado". *Íd.*

Por otro lado, en cuanto a los elementos del delito de robo está el apropiarse ilegalmente de un bien mueble perteneciente a otra persona, utilizando violencia o intimidación; ya sea previo, al momento del desplazamiento del bien o inmediatamente después para retenerlo. Además, en el robo, la sustracción o la retención del bien se hace en presencia inmediata y contra la voluntad de la persona. Artículo 189 del Código Penal de 2012, 33 LPRA sec. 5259;

Nevares Muñiz, *op. cit.,* pág. 295. En cuanto al elemento de la intimidación, este se define como la "presión moral que por miedo se ejerce sobre el ánimo para conseguir de una persona un objeto determinado". *Pueblo v. Lucret Quiñones,* 111 DPR 716, 739 (1981); D. Nevares-Muñiz, *op cit.*, págs. 296-297. La intimidación o violencia ejercida para apropiarse del bien tiene que existir coetánea al momento del desplazamiento patrimonial del bien o inmediatamente después.

En específico, el Código Penal de 2012 dispone que se comete robo agravado en cualquiera de las siguientes circunstancias:

(a) Cuando se vale de un menor que no ha cumplido dieciocho (18) años de edad;

(b) cuando el bien objeto del delito es un vehículo de motor;

(c) cuando en el curso del robo se le inflige daño físico a la víctima;

(d) cuando ocurre en un edificio ocupado donde esté la víctima o en cualquier otro lugar donde [e]sta tenga una expectativa razonable de intimidad;

**(e) cuando medie el uso de un arma de fuego en la comisión del delito**, o

(f) cuando la víctima o víctimas sean amarradas, amordazadas o se limite su libertad de movimiento durante la comisión del delito. Artículo 190 del Código Penal, 33 LPRA sec. 5260. (Énfasis nuestro).

Por último, el mismo cuerpo estatutario dispone en su Artículo 248 que:

Incurrirá en delito menos grave, toda persona que utilice una máscara o careta, postizo o maquillaje, tinte, o cualquier otro disfraz, completo o parcial, que altere de cualquier forma temporera o permanentemente su apariencia física con el propósito de:

**(a) Evitar que se le descubra, reconozca o identifique en la comisión de algún delito.**

(b) Ocultarse, evitar ser arrestad[a], fugarse o escaparse al ser denunciad[a], procesad[a] o sentenciad[a] de algún delito.

(c) Alterar o intervenir con las actividades ordinarias en una instalación pública educativa, en una

instalación de salud, o en el interior de edificios de gobierno.

Será sancionada con pena de reclusión por un término fijo de tres (3) años y la persona incurrirá en delito grave, cuando el delito cometido o intentado fuera de naturaleza grave. 33 LPRA sec. 5338. (Énfasis nuestro).

**D**

Surge de la Exposición de Motivos de la *Ley de Armas de Puerto Rico de 2020*, Ley Núm. 168-2019, según enmendada, 25 LPRA sec. 461 *et seq.* (Ley de Armas), que el propósito principal de la aprobación de dicho estatuto fue lograr una solución efectiva al problema del control de armas de fuego en manos de las personas delincuentes en Puerto Rico. La referida legislación responde al interés apremiante del Gobierno de Puerto Rico de ser más efectivo en la lucha contra el crimen. Por un lado, la Ley orienta a las personas autorizadas en Puerto Rico a manejar responsablemente sus armas de fuego. Por otro lado, apercibe a la persona delincuente de las serias consecuencias de incurrir en actos criminales utilizando armas de fuego. Por último, crea un sistema de registro electrónico con el fin de facilitar la inscripción de todas las transacciones de armas de fuego y municiones que los concesionarios de licencias de armas realicen en Puerto Rico.

En lo aquí atinente, el Artículo 6.05 de la Ley de Armas, 25 LPRA sec. 466d, establece, entre otras cosas, que:

**Toda persona que porte, transporte o use cualquier arma de fuego, sin tener una licencia de armas vigente**, salvo lo dispuesto para los campos de tiro o lugares donde se practica la caza, incurrirá en delito grave y convicto que fuere, será sancionada con pena de reclusión por un término fijo de diez (10) años, sin derecho a sentencia suspendida, a, *[sic]* o a disfrutar de los beneficios de algún programa de desvío, o a cualquier alternativa a la reclusión reconocida en esta jurisdicción. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de veinte (20) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de cinco (5) años.

No obstante, cuando se trate de una persona que (i) esté transportando o portando un arma de fuego que está

registrada a su nombre, (ii) tenga una licencia de armas expedida a su nombre que está vencida, (iii) no se le impute la comisión de cualquier delito grave que implique el uso de violencia, (iv) no se le impute la comisión de un delito menos grave que implique el uso de violencia, y (v) el arma de fuego transportada o portada no esté alterada ni mutilada, dicha persona incurrirá en un delito menos grave y, a discreción del tribunal, será sancionada con una multa que no será menor de quinientos (500) dólares ni mayor de cinco mil dólares ($5,000) o pena de cárcel que no excederá de seis (6) meses. (Énfasis nuestro).

[…]

El delito establecido en el precitado Artículo 6.05 de la Ley de Armas, *supra,* está constituido por el hecho de portar, transportar o usar cualquier arma de fuego, sin tener una licencia de armas vigente. Así, según resuelto por nuestro Tribunal Supremo, la presentación del arma no es un elemento esencial en el delito de portar armas prohibidas, que no consiste en que a una persona se le ocupe determinada clase de arma, sino en demostrar que lleva encima o en su persona cualquier arma de las que especifica la misma ley. *Pueblo v. Julián,* 18 DPR 940 (1912).

Por su parte, el Artículo 6.14 de la Ley de Armas, 25 LPRA sec. 466m, establece, entre otras cosas, que:

Incurrirá en delito grave con pena de reclusión por un término fijo de cinco (5) años, toda persona que, salvo en casos de legítima defensa, propia o de terceros, o de actuaciones en el legítimo desempeño de funciones oficiales o actividades legítimas de deportes:

(a) Voluntariamente dispare cualquier arma de fuego fuera de los lugares autorizados por este capítulo, aunque no le cause daño a persona alguna; o
**(b) intencionalmente apunte hacia alguna persona con un arma de fuego, aunque no le cause daño a persona alguna.**

De mediar circunstancias agravantes, la pena establecida podrá ser aumentada hasta un máximo de diez (10) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de un (1) año. (Énfasis nuestro).

[…]

**E**

Sabido es que la *acusación* y la *denuncia* tienen el propósito cardinal de notificar a la persona imputada de delito la causa por la cual la maquinaria estatal procura su procesamiento. Art. II, Sec. 11, Constitución del Estado Libre Asociado de Puerto Rico, LPRA Tomo I; Reglas 5, 34 y 35(c) de Procedimiento Criminal, 34 LPRA Ap. II, R. 5, 34 y 35(c); *Pueblo v. Vélez Rodríguez,* 186 DPR 621 (2012); *Pueblo v. Montero Luciano,* 169 DPR 360 (2006); *Pueblo v. Meléndez Cartagena,* 106 DPR 338 (1977). La referida premisa establece la exigencia de que todo ciudadano que se expone a ser enjuiciado por las autoridades competentes conozca sobre la naturaleza y la extensión de la conducta criminal cuya comisión se le atribuye. *Pueblo v. Soto Molina,* 191 DPR 209 (2014); *Pueblo v. Vélez Rodríguez,* supra. Así, cumplida a cabalidad dicha obligación por parte del Ministerio Público, el Estado tiene plena autorización para someter a la persona imputada a los rigores procesales correspondientes, ello tras proveerle para que presente una adecuada defensa.

En lo pertinente a la *acusación,* la doctrina es enfática al disponer que su contenido cumple con la referida garantía de notificación cuando en la misma se consigna una exposición de los hechos constitutivos de delito, redactada en un lenguaje sencillo, capaz de ser comprendido por una persona de inteligencia promedio. *Pueblo v. Vélez Rodríguez,* supra; *Pueblo v. Montero Luciano,* supra. En este contexto, la Regla 35(c) de Procedimiento Criminal, 34 LPRA Ap. II, R. 35(c), expresamente dispone que toda acusación deberá contener, entre otros datos:

> [...]
>
> (c) Una exposición de los hechos esenciales constitutivos del delito, redactada en lenguaje sencillo, claro y conciso, y de tal modo que pueda entenderla cualquier persona de inteligencia común. Las palabras usadas en dicha exposición se interpretarán en su

acepción usual en el lenguaje corriente, con excepción de aquellas palabras y frases definidas por ley o por la jurisprudencia, las cuales se interpretarán en su significado legal. Dicha exposición no tendrá que emplear estrictamente las palabras usadas en la ley, *[sic]* y podrá emplear otras que tuvieren el mismo significado. En ningún caso será necesario el expresar en la acusación o denuncia presunciones legales ni materias de conocimiento judicial.

[…]

El ordenamiento jurídico no exige que en una acusación se emplee lenguaje técnico alguno. Lo verdaderamente trascendental es que permita una apreciación clara sobre los hechos delictivos que se imputan. De esta forma, la función de la acusación es que la persona acusada pueda defenderse de la conducta punible por la cual se somete a los rigores de la ley. *Pueblo v. Vélez Rodríguez,* supra; *Pueblo v. Montero Luciano*, supra; *Pueblo v. Calviño Cereijo,* 110 DPR 691 (1981).

Ahora bien, el ordenamiento procesal vigente provee para que, en ocasión a que resulte meritorio clarificar el contenido de una denuncia o acusación, la persona acusada pueda presentar un *pliego de especificaciones. Pueblo v. Canino Ortiz,* 134 DPR 796 (1993). Sin embargo, la concesión de la petición no es un derecho absoluto, puesto que constituye una facultad discrecional del juzgador. *Íd.* Por tanto, competerá a este entender sobre la información que se solicite, a fin de resolver si, en efecto, la misma propende a la adecuada defensa de la persona acusada en el proceso al que el Estado lo somete. *Íd.*

Es importante resaltar que una acusación no será insuficiente, ni podrá ser afectado el juicio, la sentencia o cualquier otro procedimiento basado en dicha acusación, por causa de algún defecto, imperfección u omisión de forma que no perjudicare los derechos sustanciales de la persona acusada. Regla 36 de Procedimiento Criminal, 34 LPRA Ap. II, R. 36. Si la acusación adoleciera de algún defecto, imperfección u omisión de forma

aludido en la precitada Regla 36, el tribunal podrá permitir en cualquier momento las enmiendas necesarias para subsanarlo. Regla 38(a) de Procedimiento Criminal, 34 LPRA Ap. II, R. 38(a).

En particular, existen dos tipos de defectos: (1) el de forma y (2) el sustancial. El defecto de forma es una imperfección u omisión en el formato del pliego acusatorio que no afecta los derechos sustanciales de la persona acusada y que no hace insuficiente al pliego, ni al proceso posterior. Se trata de un defecto subsanable. D. Nevares Muñiz, *Sumario de Derecho Procesal Penal Puertorriqueño*, 10ma ed. rev., San Juan, P.R., Ed. Instituto para el Desarrollo del Derecho, Inc., 2014, págs. 120-121. En ausencia de una enmienda, dicho defecto se entenderá subsanado una vez el jurado rinda el veredicto o el tribunal emita el fallo. Un defecto de forma puede enmendarse en cualquier momento, pero de no hacerse, quedará subsanado al recaer el fallo o veredicto. Regla 38(a) de Procedimiento Criminal, *supra.*

Por otro lado, si la acusación adoleciere de algún defecto u omisión sustancial, el tribunal en el cual se ventilare el proceso originalmente, podrá permitir, en cualquier momento antes de la convicción o absolución, las enmiendas necesarias para subsanarlo. Si se tratare de una acusación, la persona acusada tendrá derecho a que se le celebre de nuevo el acto de la lectura de la acusación. Regla 38(b) de Procedimiento Criminal, 34 LPRA Ap. II, R. 38(b). El nuevo acto de lectura de acusación tiene como consecuencia la concesión de un nuevo plazo para contestar y formular nuevas alegaciones, y la oportunidad de solicitar que se le conceda el derecho a juicio por jurado, aun cuando lo hubiera renunciado previamente bajo el pliego acusatorio originalmente presentado, toda vez que, con el nuevo acto de lectura de acusación, "se borra la tabla" con relación a actuaciones anteriores de la persona acusada. J. Fontanet Maldonado, *El Proceso Penal de Puerto Rico: Etapa*

*Investigativa e Inicial del Proceso*, San Juan, P.R., Ed. InterJuris, 2008, Tomo I, pág. 306.

Un pliego acusatorio tendrá un defecto sustancial cuando falte uno de los elementos esenciales del delito imputado. Un elemento esencial es todo aquel hecho que es necesario para imputar y probar la conducta en cuestión, como un delito. *Pueblo v. González*, 97 DPR 541, 544 (1969). Ello, de forma que cualquier persona acusada de inteligencia mediana pueda, en efecto, entender de qué se le acusa. *Pueblo v. Montero Luciano*, supra; *Pueblo v. Calviño Cereijo*, supra. Para cumplir con este requisito constitucional, la precitada Regla 35(c) de Procedimiento Criminal, *supra*, no exige que la acusación siga fielmente las palabras de la ley, tampoco es necesario que el Estado emplee un lenguaje "talismánico o estereotipado", pues su propósito no es "cumplir mecánicamente con un ritual", sino informar a la persona acusada sobre el delito que se le imputa. *Pueblo v. Calviño Cereijo*, supra; *Pueblo v. Meléndez Cartagena*, supra.

En cuanto a los elementos de "a sabiendas o intencionalmente", el Tribunal Supremo de Puerto Rico determinó en *Pueblo v. Meléndez Cartagena*, supra, págs. 341-342, que las alegaciones de la acusación, a los efectos de que la persona acusada actuó "ilegal, voluntaria, maliciosa y criminalmente", son suficientes en derecho para imputar los delitos allí contenidos, aun en ausencia de la frase "a sabiendas". Nuestro más Alto Foro resolvió que el contenido esencial de tal expresión está comprendido en las alegaciones citadas, por lo que la persona acusada fue adecuadamente informada de los delitos por los que sería enjuiciada. *Íd.*

Si hay un defecto sustancial, el pliego acusatorio va a ser defectuoso, por lo que una vez recaiga el fallo o el veredicto, si no se hubiera corregido ese defecto, la convicción no se podrá sostener.

Nevárez Muñiz, *op. cit.*, pág. 122. En otras palabras, en caso de existir un defecto sustancial, se trata de un pliego acusatorio insuficiente el cual, de no ser enmendado para subsanar el defecto sustancial antes de recaer fallo o veredicto, hará nula la convicción. Ahora bien, si el Estado solicita la enmienda oportunamente, antes del fallo o veredicto, el tribunal tiene que concederla. Concedida la enmienda, habrá que ver las consecuencias que la misma tendrá en el proceso, lo cual dependerá del momento en que esta se hace. *Íd.*

**F**

La *prueba de referencia* es definida como toda aquella "declaración que no sea la que la persona declarante hace en el juicio o vista, que se ofrece en evidencia para probar la verdad de lo aseverado". Regla 801(c) de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 801(c). Como regla general, este tipo de evidencia es inadmisible en los procesos judiciales. Regla 804 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 804. Su exclusión se debe a la falta de oportunidad de la parte adversa en contrainterrogar a la persona declarante, los riesgos que ella representa en cuanto a la narración del evento, percepción, recuerdo del acontecimiento y sinceridad de la declarante. *Pueblo v. Santiago Colón,* 125 DPR 442, 446 y 449 (1990) (sentencia).

Cuando se pretende utilizar prueba de referencia contra una persona acusada, se activa la protección constitucional del derecho a confrontación consagrado tanto en la Enmienda Sexta de la Constitución de los Estados Unidos, como en la Sección 11 de nuestra Constitución. Dicha protección constitucional no solo garantiza el derecho al careo, sino que también implica que cierta prueba de referencia, si es testimonial, será excluida a pesar de caer bajo alguna de las excepciones a la regla de exclusión codificadas en las Reglas de Evidencia. *Crawford v. Washington,* 541 US 36 (2004); *Pueblo v. Guerrido López,* 179 DPR 950 (2010). El derecho a la

confrontación recoge el principio fundamental de que se ponga a la persona acusada en posición de poder enfrentar a sus acusadores. *Pueblo v. Cruz Rosario,* 204 DPR 1040, 1048 (2020). Este derecho tiene tres (3) vertientes procesales: (1) derecho al careo o confrontación cara a cara con los testigos adversos; (2) derecho a contrainterrogar; y (3) derecho a excluir la prueba de referencia que intente presentar el Ministerio Público. *Íd.*; *Pueblo v. Pérez Santos,* 195 DPR 262, 269–270 (2016).

En otras palabras, es claro que dicha prueba de referencia lesiona el derecho que tienen las partes a confrontarse con la evidencia que se presente en su contra. *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.,* 123 DPR 1, 34-35 (1988). Sin embargo, cabe destacar que, si la parte adversa tiene o ha tenido la oportunidad de contrainterrogar a la persona declarante, se disipan los inconvenientes que trae consigo la prueba de referencia y la declaración realizada debe admitirse en evidencia. *Pueblo v. Santiago Colón,* supra, pág. 449.

La regla de exclusión está esencialmente fundada en el hecho de que la misma no ofrece garantías circunstanciales de confiabilidad y exactitud. *P.N.P. v. Rodríguez Estrada, Pres. C.E.E.,* supra. El profesor Ernesto L. Chiesa Aponte señala que la razón que motiva la regla general de exclusión de prueba de referencia es la falta de confiabilidad de la misma y su dudoso valor probatorio, puesto que, de ordinario, una declaración que constituye prueba de referencia no tiene las garantías de confiabilidad que se produce mediante un testimonio en corte. Un testimonio en corte se hace bajo juramento, frente a la parte perjudicada por la declaración, frente al juzgador que ha de aquilatar su valor probatorio y está sujeta al contrainterrogatorio de las partes que tengan a bien hacerlo. E. L. Chiesa Aponte, *Tratado de Derecho Probatorio (Reglas*

*de Evidencia de Puerto Rico y Federales)*, República Dominicana, Pubs. J.T.S., Tomo II, págs. 616-617.

Ahora bien, como todo principio general, el mismo no es absoluto, por lo que existen excepciones a la regla de exclusión de prueba de referencia y estas están reguladas por las Reglas 805 a la 809 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 805-809. Claro está, si ninguna de las circunstancias taxativamente enumeradas en los preceptos antes citados se configura, el foro de instancia deberá descartar la evidencia ofrecida.

Entre las excepciones a la regla de exclusión de la prueba de referencia, la Regla 803(e) de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 803(e), permite la admisión en evidencia de las declaraciones de una persona conspiradora hecha en el transcurso de la conspiración y para lograr su objetivo. La citada Regla dispone que el contenido de la declaración se tomará en consideración, pero no será suficiente por sí sola para establecer la existencia de la conspiración y la participación en esta de la persona declarante y de la parte contra quien se ofrece la declaración. *Íd.*

Con tal fin, el juzgador de instancia debe recibir prueba independiente que tienda a demostrar: (1) la existencia de la conspiración entre la persona declarante y la persona contra la cual se ofrece la declaración como prueba; (2) que la declaración fue hecha durante la vigencia de la conspiración, y (3) que la declaración fue hecha en la consecución de los fines de la conspiración. *Pueblo v. Meliá León*, 143 DPR 708, 732 (1997).

Ahora bien, los requisitos para configurar una "conspiración" en el ámbito del Derecho Probatorio son más laxos que los requeridos para establecer responsabilidad penal por el delito de "conspiración" estatuido en el Código Penal. En ese sentido, nuestro Tribunal Supremo ha señalado que:

No es preciso demostrar la existencia de una conspiración en los términos requeridos por un estatuto penal. Por ello, el *quantum* de prueba requerido para establecer su existencia es menor que el requerido para demostrar la culpabilidad de una persona por el delito de conspiración tipificado en el Código Penal. *Pueblo v. Meliá León*, supra.

Acorde con lo anterior, no es necesario probar la conspiración más allá de toda duda razonable, sino que la decisión del juzgador se regirá por la preponderancia de la evidencia. *Pueblo v. Lebrón López*, 96 DPR 274, 282 (1968). Como cuestión de umbral, resulta preciso reiterar que, las declaraciones bajo la Regla 803(e) de Evidencia de Puerto Rico, *supra*, deben hacerse durante la vigencia de la conspiración. De incumplir con el mencionado requisito, dichas declaraciones serán inadmisibles. En vista de ello, el profesor Chiesa Aponte advierte lo siguiente:

Antes de la vigencia de la conspiración no hay razón alguna para la precisión en las declaraciones relativas al éxito de la conspiración, y ya terminada esta puede muy bien ocurrir que los antes conspiradores se tornen enemigos entre sí. Esto en cuanto al elemento de confiabilidad. En cualquier caso, antes de la vigencia de la conspiración y luego de esta terminar, no hay agencia que sirva de base a la regla de admisión. La declaración tiene que haberse hecho cuando la conspiración estaba en progreso, esto es, ya perfeccionado el acuerdo y antes de terminada la conspiración. E. L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Ed. Fórum, 1993, Vol. III, Sec. 25.2 A, págs. 677-678.

Por su parte, el tratadista Rolando Emmanuelli Jiménez hace hincapié en la importancia de cumplir a cabalidad con lo dispuesto en la Regla 803(e) de Evidencia de Puerto Rico, *supra*, cuando el Ministerio Público pretende presentar, como prueba, las admisiones de una persona conspiradora:

Si no se cumple estrictamente con los requisitos del inciso (e) en un caso criminal, la presentación de la admisión de un[a] [persona] conspirador[a] en contra de otr[a] puede menoscabar gravemente el derecho a la confrontación. R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño*, 4ta ed., San Juan, Ediciones Situm, 2015, pág. 485.

**G**

El inciso (a) de la Regla 104 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 104(a), establece el proceso a seguir cuando una parte entiende que se ha admitido o excluido evidencia erróneamente. En síntesis, la norma establece que, para evitar la admisión errónea de evidencia, la parte interesada debe presentar una objeción oportuna, específica y correcta o una moción para que se elimine del récord evidencia que fue erróneamente admitida cuando el fundamento para objetar surge con posterioridad. *Íd.* La objeción es oportuna cuando se formula al momento mismo en que surge el fundamento para objetar o inmediatamente después. E. L. Chiesa Aponte, *Reglas de Evidencia Comentadas,* 1ra ed., San Juan, Ediciones SITUM, Inc., 2016, pág. 27. De no hacerse en ese momento, se entiende que la parte ha renunciado a plantear el problema en apelación. *Pueblo v. Rivero, Lugo y Almodóvar,* 121 DPR 454 (1988). La objeción también debe ser específica y correcta en el sentido de invocar el fundamento adecuado cuando este no surge del contexto. Chiesa Aponte, *op. cit.,* pág. 28. A su vez, la citada regla reconoce que, para evitar la exclusión errónea de prueba, la parte que propone la evidencia debe hacer una oferta de prueba mediante un resumen de la prueba o un interrogatorio. 32 LPRA Ap. VI, R. 104(b).

De otro lado, la Regla 105 de Evidencia de Puerto Rico, 32 LPRA Ap. VI, R. 105, aclara cuál será el efecto de admitir o excluir evidencia erróneamente, al disponer que:

> (a) *Regla general.*—No se dejará sin efecto una determinación de admisión o exclusión errónea de evidencia ni se revocará por ello sentencia o decisión alguna a menos que:
>
> > (1) La parte perjudicada con la admisión o exclusión de evidencia hubiere satisfecho los requisitos de objeción, fundamento u oferta de prueba establecidos en la Regla 104 de este apéndice, y

(2) el tribunal que considera el señalamiento estime que la evidencia admitida o excluida fue un factor decisivo o sustancial en la sentencia emitida o decisión cuya revocación se solicita.

(b) *Error constitucional.*—Si el error en la admisión o exclusión constituye una violación a un derecho constitucional de la persona acusada, el tribunal apelativo s[o]lo confirmará la decisión si está convencido más allá de duda razonable que, de no haberse cometido el error, el resultado hubiera sido el mismo.

En síntesis, esta norma establece que, de determinarse que hubo una admisión o exclusión errónea de evidencia, no se dejará sin efecto, ni se revocará resolución u orden alguna salvo que se satisfagan dos requisitos: (1) se hizo la objeción u oferta de prueba correspondiente ante el Tribunal de Primera Instancia de conformidad con la Regla 104 de Evidencia de Puerto Rico, *supra,* y (2) el tribunal que considera el efecto del error entiende que este tuvo un efecto sustancial en el dictamen que se pretende revocar. Chiesa Aponte, *op. cit.,* pág. 31. El segundo requisito se refiere a la importancia del error, ello conlleva que al examinarlo el tribunal evalúe cuál es la probabilidad de que, de no haberse cometido el error, el resultado hubiera sido distinto. *Íd.*, pág. 32. De estimar que el error no tuvo un efecto significativo en el resultado del caso y que, por tanto, es un *harmless error,* deberá confirmar el dictamen a pesar del error. *Íd.*

Ahora bien, de conformidad con el inciso (b) de la Regla 105 de Evidencia de Puerto Rico, *supra*, si el error en la admisión o exclusión de evidencia lesiona un derecho constitucional de la persona acusada, no procede declarar tal error como *harmless*, a menos de que el tribunal que lo examina esté convencido más allá de duda razonable de que, de no haberse cometido el error, se hubiera llegado al mismo fallo o veredicto. Chiesa Aponte, *op. cit.,* pág. 33. Le corresponde a la persona convicta que apela la sentencia condenatoria establecer, a satisfacción del tribunal apelativo, que se

cometió un error constitucional; y al Procurador General persuadir más allá de duda razonable de que, de no haberse cometido el error, el fallo o veredicto hubiera sido el mismo. *Íd.*

Adviértase que es solo después que un tribunal apelativo determina que hubo una admisión o exclusión de evidencia errónea, que procede realizar el análisis sobre la probabilidad de un resultado distinto en el fallo o veredicto de no haberse cometido el error.

**H**

La *Ley de Compensación y Servicios a las Víctimas y Testigos de Delito*, Ley Núm. 183-1998, según enmendada, 25 LPRA sec. 981 *et seq.* (Ley Núm. 183-1998), tiene como propósito fundamental ampliar los derechos de las víctimas de delito mediante un mecanismo de compensación monetaria que se nutre de la pena especial impuesta por los tribunales a las personas transgresoras de diversos delitos. De esta manera, a las víctimas de delito se les brinda una compensación económica para ayudarles a afrontar los gastos incurridos como consecuencia de los daños, pérdidas o gastos médicos razonables derivados de la acción delictiva.

Dicho estatuto enmendó el entonces Código Penal de Puerto Rico de 1974, para añadirle el Artículo 49-C, 33 LPRA sec. 3214. El nuevo articulado establecía que los tribunales sentenciadores impondrían a toda persona convicta, además de la pena por el delito cometido, una pena monetaria equivalente a cien dólares ($100) por cada delito menos grave cometido, o trescientos dólares ($300) por cada delito grave. Además, la Asamblea Legislativa estableció que la referida pena especial se pagaría mediante sellos de rentas internas. Asimismo, se dispuso que las cantidades recaudadas ingresaran al *Fondo Especial de Compensaciones a Víctimas de Delito.*

Por su parte, el Código Penal de Puerto Rico de 2004 recogió esta pena especial en su Artículo 67, la cual, a su vez, se codificó en

el Artículo 61 del vigente Código Penal de 2012.[154] 33 LPRA sec. 5094. Las enmiendas al Código Penal de Puerto Rico de 2012 introducidas mediante la Ley Núm. 246-2014 no enmendaron el Artículo 61 antes aludido. Es por ello que, la norma de derecho sobre la pena especial ha permanecido inalterada en su propósito y redacción a través de las diversas enmiendas al Código Penal de Puerto Rico, salvo por ciertas exclusiones y modificaciones sobre el modo de pago, entre otros aspectos, que se introdujeron a la Ley Núm. 183-1998, *supra.*

Cónsono con lo anterior, la *Ley para la Imposición de la Pena Especial del Código Penal de Puerto Rico*, Ley Núm. 34-2021, 4 LPRA sec. 1661 *et seq.,* (Ley Núm. 34-2021), se promulgó recientemente con el fin de poder establecer un procedimiento que permita considerar la indigencia de una persona convicta al determinar la imposición de la pena especial establecida en el Código Penal de Puerto Rico. Dicho estatuto dispuso como política pública del Estado Libre Asociado de Puerto Rico el garantizar la igual protección de las leyes a toda persona convicta que por su condición social no pueda satisfacer la pena especial que nuestro Código Penal establece. 4 LPRA sec. 1662. Ello, en pro de su rehabilitación moral y social. *Íd.*

En particular, la Sección 4 del aludido estatuto decreta que los tribunales, ya sea *motu proprio* o a solicitud de la persona convicta, podrá eximir del pago de la pena especial del Código Penal de Puerto Rico, siempre y cuando se cumpla con al menos una de las siguientes condiciones:

1. El Ministerio Público no presente objeción fundada para que se le exima.

2. La persona convicta es indigente representad[a] por la Sociedad para la Asistencia Legal, por una

---

[154] El Código Penal de Puerto Rico de 2012 se adoptó en virtud de la Ley Núm. 146-2012, mientras que las enmiendas a este cuerpo regulatorio se introdujeron mediante la Ley Núm. 246-2014.

institución que ofrezca representación legal gratuita a indigentes, o un abogado de oficio.

3. Por fundamento de indigencia constatado a satisfacción del tribunal. 4 LPRA sec. 1664.

La citada sección, además, dispone que la indigencia de la persona convicta se presumirá en los siguientes casos:

(1) Esté representada por alguna organización, persona o entidad que ofrezca servicios de representación legal a personas de escasos recursos económicos, o

(2) aun cuando cualifique o haya cualificado para estar representada por alguna organización, persona o entidad que ofrezca servicios de representación legal a personas de escasos recursos económicos, por alguna razón no relacionada a sus recursos económicos, no pudo ser representad[a] por estos. 4 LPRA sec. 1664.

Además de disponer para que se exima del pago de la pena especial a aquellas personas convictas indigentes, la Ley Núm. 34-2021, *supra*, reconoce discreción a los tribunales para que, en aquellos casos en que la persona convicta no sea eximida, en consideración a su situación económica, pueda establecerse el pago de la pena especial mediante pagos a plazos. 4 LPRA sec. 1665.

En ese sentido, luego de dictada la sentencia, la persona convicta podrá presentar una petición para la celebración de una vista con el fin de considerar la concesión de la exención o el pago a plazos. 4 LPRA sec. 1666. En dicha petición, la parte peticionaria deberá exponer las razones por las cuales desea que se realice la vista, basada en su condición de indigencia o falta de capacidad económica para satisfacer la pena especial correspondiente. *Íd.* Celebrada la vista, el foro primario determinará si procede la exención, el pago a plazos o el saldo total de la pena especial impuesta a la persona convicta. *Íd.*

A la luz de la normativa antes expuesta, procedemos a disponer de las controversias ante nuestra consideración.

**III**

La parte apelante sostiene en su segundo señalamiento de error que el Tribunal de Primera Instancia incidió al dictar *Sentencia* por el Artículo 6.14(a) de la Ley de Armas, *supra*, cuando la acusación no imputa delito y, por tanto, carecía de jurisdicción para enjuiciar por ese delito. En particular, plantea que la descripción incluida en la *Acusación* del Caso Núm. ISCR202100152 no imputa la modalidad de disparar un arma tipificada en el inciso (a) del Artículo 6.14 del citado estatuto, y tampoco imputa la modalidad de apuntar un arma intencionalmente según establece el inciso (b) del mencionado articulado. Especifica que en la acusación en cuestión carece el elemento de intención (*mens rea*), toda vez que la acusación falla en imputar que el acto fue intencionalmente. Argumenta que la omisión de un elemento esencial en la acusación acarrea la revocación de la *Sentencia,* al amparo del debido proceso de ley. Por otro lado, sostiene que la determinación de causa durante la vista preliminar fue por el inciso (a) del Artículo 6.14 de la Ley de Armas, *supra*, pero el Ministerio Público no presentó un ápice de prueba que evidencie que el arma utilizada en la comisión del robo agravado fuese disparada en algún momento. Según adujo, ninguno de los testimonios menciona que el arma fue disparada. En vista de ello, arguye que el delito de disparar un arma de fuego no se probó fuera de duda razonable, por lo que procede la revocación de la *Sentencia* en el Caso Núm. ISCR202100152.

Por su lado, la parte apelada sostiene que la acusación por el delito de apuntar un arma de fuego hacia otra persona cumplió con informar cabalmente a Durán Gutiérrez sobre el delito que le fue imputado y le permitió preparar una defensa adecuada ante las alegaciones del Estado. Argumenta que la cita incorrecta de la disposición penal es un defecto de forma que quedó subsanado con el fallo de culpabilidad emitido por el foro primario. Especifica que

el pliego acusatorio cumple cabalmente con su fin de notificar adecuadamente a Durán Gutiérrez de la violación a la Ley de Armas, que este cometió cuando le apuntó a Aquino Rivera con un arma de fuego, mientras ejecutaba el robo agravado de la gasolinera.

Según aduce la parte apelada, la acusación no solo contenía todos los elementos del delito de apuntar un arma de fuego, sino que se probó más allá de duda razonable. Plantea que, de ninguna parte del récord surge que la ausencia del elemento de "intención" haya afectado la capacidad del apelante en preparar su defensa, o de impugnar efectivamente a los testigos de cargo. Sostiene que, desde el inicio del encausamiento, el apelante siempre estuvo informado de que la infracción al Artículo 6.14 de la Ley de Armas, *supra*, correspondía al acto delictivo de apuntarle con un revólver a otra persona. Indica que la discrepancia en el inciso del mencionado artículo de ninguna manera conlleva la revocación de la sentencia, ya que se trata de un defecto de forma que quedó subsanado tan pronto recayó el fallo de culpabilidad, a tenor con lo dispuesto en la Regla 38(a) de Procedimiento Criminal, *supra.*

De otro lado, la parte apelada explica que, aunque el delito de apuntar un arma de fuego está tipificado en el inciso (b) del precitado artículo, ello no impedía que el proceso penal siguiera su curso bajo una acusación que citaba un inciso erróneo. Alega que lo crucial es que los hechos imputados permitan identificar el delito por el cual verdaderamente se está acusando y la disposición de ley infringida. Arguye que no hay duda de que la acusación del Caso Núm. ISCR202100152 describe el delito de apuntar un arma de fuego y que este es el delito que fue probado más allá de duda razonable. Reitera que la citación errónea de la disposición legal que pretendía imputarse no puede ser interpretada como una falta que conlleve la absolución, pues, según expuesto, se trata de un defecto de forma que no afecta los derechos sustanciales del acusado.

Según esbozáramos, un pliego acusatorio tendrá un defecto sustancial cuando falte uno de los elementos esenciales del delito imputado. Un elemento esencial es todo aquel hecho que es necesario para imputar y probar la conducta en cuestión, como un delito. Si hay un defecto sustancial, el pliego acusatorio va a ser defectuoso, por lo que una vez recaiga el fallo o el veredicto, si no se hubiera corregido ese defecto, la convicción no se podrá sostener. Por otro lado, un defecto de forma es una imperfección u omisión en el formato del pliego acusatorio que no afecta los derechos sustanciales de la persona acusada y que no hace insuficiente al pliego, ni al proceso posterior. Se trata de un defecto subsanable. En ausencia de una enmienda, dicho defecto se entenderá subsanado una vez el jurado rinda el veredicto o el tribunal emita el fallo.

En el Caso Núm. ISCR202100152 que obra en autos, la *Acusación* le imputa a Durán Gutiérrez la comisión del delito establecido en el inciso (a) del Artículo 6.14 de la Ley de Armas, *supra.* En particular, dicha *Acusación* reza como sigue:

> El referido acusado[,] GIOVANNI DUR[Á]N GUTI[É]RREZ, allá en o para el día 16 de septiembre de 2020 y en Añasco[,] Puerto Rico, que forma parte de la jurisdicción del Tribunal de Primera Instancia, Sala de Mayagüez, **ilegal, voluntaria y criminalmente**[,] y actuando en común y mutuo acuerdo con Nylma Rivera Padilla y Oscar Abdiel Olivo Crespo, **apuntó con un arma de fuego**, rev[ó]lver, pequeño color negro, al Sr. Wilfredo Aquino Rivera hacia el área del pecho.
>
> Hecho contrario a la Ley. (Énfasis nuestro).[155]

De una lectura de la precitada acusación, queda claro que existe un error en el inciso citado del Artículo 6.14 de la Ley de Armas, *supra,* pues en la descripción de la comisión del delito no se incluye el acto de "disparar", que es el estatuido en el precitado

---

[155] Véase, *Acusación* en los autos originales del Caso Núm. ISCR202100152.

inciso (a), sino que se utiliza el elemento de "apuntar" establecido en el inciso (b) del referido artículo.

No obstante, en la mencionada descripción, se esbozan todos los elementos del delito de apuntar con un arma de fuego, según tipificado en el citado estatuto. A modo ilustrativo, el inciso (b) del Artículo 6.14 de la Ley de Armas, 25 LPRA sec. 466m(b), establece, entre otras cosas, que:

> Incurrirá en delito grave con pena de reclusión por un término fijo de cinco (5) años, toda persona que, salvo en casos de legítima defensa, propia o de terceros, o de actuaciones en el legítimo desempeño de funciones oficiales o actividades legítimas de deportes:
>
> [...]
>
> (b) **intencionalmente** apunte hacia alguna persona con un arma de fuego, aunque no le cause daño a persona alguna. (Énfasis nuestro).
>
> [...]

Del inciso (b) del precitado artículo surge que, para que se cometa el delito de apuntar, el imputado tiene que (1) apuntar con un arma de fuego a una persona, (2) intencionalmente. En el Caso Núm. ISCR202100152 se le acusó a Durán Gutiérrez de (1) apuntar con un arma de fuego a Aquino Rivera, (2) **ilegal, voluntaria y criminalmente**. Si bien se utilizaron las palabras "ilegal, voluntaria y criminalmente", en lugar de la palabra "intencionalmente" contemplada en el precitado artículo, el contenido esencial de tal expresión está comprendido en las alegaciones citadas. Recordemos que la acusación debe contener una expresión de los hechos esenciales constitutivos del delito redactada en un lenguaje sencillo, claro y conciso, de tal modo que pueda entenderla cualquier persona de inteligencia común. En ese sentido, no es necesario utilizar estrictamente las palabras esbozadas en la ley, pues se podrá emplear otras que tengan el mismo significado. Conforme a la normativa antes expuesta, la falta de inclusión de la palabra "intencionalmente" no afectó sustancialmente los derechos del

apelante, toda vez que fue adecuadamente informado sobre el delito imputado. En este caso, los vocablos "ilegal, voluntaria y criminalmente" son suficientes en derecho para imputar el delito de apuntar un arma de fuego, toda vez que estos constituyen un lenguaje sencillo utilizado como sinónimos de la palabra "intencionalmente", lo cual puede ser entendido por cualquier persona de inteligencia común como Durán Gutiérrez. Por lo tanto, lo anterior no constituye un error sustancial ni tornó el pliego acusatorio en uno defectuoso.

Examinado lo anterior, colegimos que estamos únicamente ante un defecto de forma, que si bien no fue enmendado durante el proceso judicial, este fue subsanado una vez se rindió el fallo de culpabilidad emitido por el Tribunal de Primera Instancia. En ese sentido, y como detallamos anteriormente, la cita errónea de un estatuto es insuficiente y no afecta la sentencia apelada, toda vez que no se perjudicaron los derechos sustanciales de la persona acusada. Al hacerse la lectura de la *Acusación*, el aquí apelante quedó debidamente notificado de la causa por la cual sería enjuiciado y conocía la naturaleza y extensión de la conducta criminal cuya comisión se le atribuía, según requiere nuestro ordenamiento jurídico. Por tanto, el segundo error señalado no se cometió.

Por otro lado, como primer señalamiento de error, el apelante plantea que el Tribunal de Primera Instancia incidió al encontrarlo culpable en virtud de una prueba que no derrotó la presunción de inocencia y mucho menos estableció la culpabilidad fuera de duda razonable. Alega que, en el presente caso, existe duda razonable en cuanto a su conexión con los delitos cometidos. En específico, arguye que las únicas huellas dactilares que se encontraron en la escena fueron las de Rivera Padilla. Sobre ese particular, especifica que en ninguno de los lugares donde el asaltante estuvo encontraron

huellas dactilares suyas. Puntualizó que, según las declaraciones de Olivo Crespo, quien lo acompañaba el día de los hechos era una persona a quien llamó "Negro"; sin embargo, durante el juicio no se estableció que el apelante fuera conocido por ese apodo. Particularizó que fue el agente Bisbal Torres quien escribió en sus notas y en el informe de declaración de persona sospechosa de Olivo Crespo que "Negro" es Durán Gutiérrez.

Según aduce el apelante, como parte de la investigación, tampoco se realizó una rueda de detenidos o identificación por voz. En cuanto a su identificación, sostiene que Aquino Rivera no había dado una descripción detallada y había admitido que lo identificó en corte ya que lo había visto anteriormente en los señalamientos pasados del caso. Concluye que su identificación fue incorrecta y la evidencia presentada era contradictoria en cuanto a su estatura, el cual era el único factor detallado mencionado por Aquino Rivera en su declaración. Plantea que la investigación estaba viciada, fue incompleta y dirigida únicamente a inculparlo de los hechos.

En síntesis, el apelante arguye que, analizada la totalidad de las circunstancias del caso, la identificación que culminó en su convicción carece de garantías de confiabilidad y es contradictoria. Según alega, su culpabilidad no fue probada más allá de duda razonable. Enfatiza que la identificación consistió en una prueba que no alcanza el grado exigido en derecho, está viciada y fue sugestiva. Reiteró que la limitada descripción brindada por Aquino Rivera no concuerda con las características físicas suyas. Especifica que no se realizó una identificación por fotografías con Aquino Rivera quien fue la persona que vio al asaltante, sino que se identificó por medio de su expareja, Rivera Padilla. Particulariza que las irregularidades y contradicciones antes indicadas en el caso de autos evidencian la duda razonable que hace procedente la revocación de las sentencias apeladas. Sostiene que la poca

confiabilidad de la identificación desde el comienzo de la investigación, las irregularidades discutidas y la falta de evidencia de corroboración de la identificación genera duda razonable, lo cual hace procedente la revocación de las sentencias apeladas.

Por su lado, la parte apelada arguye que la totalidad de la prueba desfilada, no solo le resultó creíble al juzgador de los hechos, sino que, al analizarse de manera integral, logró establecer satisfactoriamente y más allá de duda razonable la culpabilidad del apelante. Argumentó que la prueba desfilada por el Ministerio Público derrotó la presunción de inocencia del apelante y demostró que este cometió los delitos en cuestión. Según aduce, el apelante obvió que Rivera Padilla lo identificó positivamente porque tuvieron una relación de pareja. Añadió que dicha testigo declaró que el apelante utilizó una máscara para no ser identificado. A su vez, indica que Aquino Rivera reconoció que, si bien el asaltante llevaba puesta una máscara, el apelante tiene la misma estatura y físico que este. Igualmente, sostiene que dicho testigo declaró que la cabeza y los ojos del apelante eran comparables con los del asaltante que le apuntó con el arma de fuego.

En cuanto a las alegaciones sobre la identificación realizada por Aquino Rivera, la parte apelada alega que cualquier discrepancia es inmaterial, especialmente cuando el mencionado testigo fue apuntado con un arma de fuego y amenazado durante su jornada laboral, lo cual le impidió ofrecer la estatura exacta del apelante. Arguye que es imposible describir al detalle el rostro de quien decide enmascararse con el propósito de que no lo descubran, pero ello no significa que, mediante la complexión física, estatura y cabello no se pueda identificar a la persona. Abunda que lo anterior tampoco significa que no lo pueda identificar un testigo de cargo que lo conocía, como es el caso de la testigo Rivera Padilla, lo cual hacía

innecesario el tener que acudir a los métodos de identificación reconocidos en las Reglas de Procedimiento Criminal.

La parte apelante centra su argumentación en la falta de conexión de su persona con los hechos en cuestión, por entender que la identificación durante el proceso investigativo y judicial estuvo viciada y no se utilizaron métodos alternos, como la identificación por fotografías para identificar al asaltante.

Sabido es que no puede haber una convicción sin prueba que conecte o señale a una persona imputada de delito, fuera de duda razonable, como la responsable de los hechos delictivos que se le imputan. La celebración de un procedimiento alterno de identificación, como la rueda de detenidos y la identificación por voz, son instrumentos reservados cuando la confusión, el correr del tiempo, la difícil percepción, el recuerdo tenue, la inseguridad del testigo, o cualquier otro factor en evaluación lógica enerve la razonable certeza exigida de quien señala a la persona autora del delito. Ello necesariamente alude a que el procedimiento de identificación que realiza la víctima o testigo del delito, además de ser el que nuestra jurisprudencia cataloga como el más confiable, es el más cotidiano o usual. Por otro lado, cabe resaltar que, si la víctima o testigo conocía previamente a la persona acusada, no es necesario observar un procedimiento alterno de identificación. Es decir, lo importante no es el método que se utilice para la identificación de la persona acusada, sino que la identificación se haya hecho de forma libre, espontánea y confiable. En ese sentido, para concluir que la identificación satisface ese *test*, es necesario efectuar un análisis contextualizado de la totalidad de las circunstancias.

Surge de la transcripción de la prueba oral ante nuestra consideración que el apelante fue identificado en sala como el asaltante de la estación *Puma* por el testigo Aquino Rivera, víctima

de los hechos en controversia. En particular, Aquino Rivera identificó al apelante de la siguiente forma

[…]

F. RIVERA:          Le pregunto[,] ¿esa persona que usted ese día vio que se acercó a usted y que le apunt[ó] con un arma de fuego[,] este…si usted sabe quién es esa persona?

W. AQUINO:        Me puede repetir la pregunta.

F. RIVERA:          ¿Si usted sabe quién fue esa persona que le apunt[ó] a usted con el arma de fuego? ¿[S]i la ha visto?

W. AQUINO:        Pues dejándome llevar por lo[s], por lo[s] datos físicos que di eh…

F. RIVERA:          ¿Quién es?

W. AQUINO:        …Lo puedo decir que está aquí presente.

F. RIVERA:          ¿Dónde está?

W. AQUINO:        En el área de la mesa.

F. RIVERA:          Que conste que ha señalado al acusado. Le pregunto[,] este… ¿Cómo compara la persona que está sentada al lado del [l]icenciado Ríos a la persona que se acercó a usted ese día de los hechos apuntándole a usted con un arma de fuego?

W. AQUINO:        ¿Qué cómo la comparo?

F. RIVERA:          ¿Cómo l[a] compara [a] esta persona con aquella?

W. AQUINO:        Por la estatura que tiene, por el este…físico de cuerpo…*[sic]*

F. RIVERA:          Mjm.

W. AQUINO:        Am, por el área de la cabeza y el área de los sojos(sic).

F. RIVERA:          ¿Y el área?

W. AQUINO:        De los ojos.[156]

[…]

De lo anterior surge que el testigo Aquino Rivera identificó al

---

[156] TPO, pág. 107, líneas 24-30; pág. 108, líneas 1-15.

apelante por las características físicas que recordaba del asaltante. Este testigo fue consistente en su testimonio y su descripción del autor de los hechos no varió de la que le proveyó al agente Bisbal Torres durante la investigación realizada el mismo día de los hechos. Dicha descripción, con la cual Aquino Rivera identificó al apelante como autor de los hechos, fue corroborada por el agente Bisbal Torres en el sistema CRADIC. Aunque Aquino Rivera admitió que el asaltante llevaba una máscara puesta al momento del robo, ello no le impidió observar otras características prominentes que le permitieron comparar con el aspecto del apelante en sala y lograr una identificación positiva, conectándolo así a Durán Gutiérrez con los hechos delictivos.

No obstante, el apelante reitera que, para que la identificación no fuere viciada, era necesario utilizar un método alterno de identificación, como el de las fotografías. No le asiste la razón.

En el caso de autos, la testigo Rivera Padilla también identificó al apelante como autor de los hechos que nos ocupan. Esta testigo, no solo fue participante en el delito, sino que conocía personalmente a Durán Gutiérrez, ya que ambos tenían una relación consensual en ese momento y durante ocho (8) meses previos al suceso. Es decir, Rivera Padilla, como testigo y participante de los hechos, conocía personalmente al asaltante, lo cual hace innecesario llevar a cabo un procedimiento alterno de identificación, según propuesto por la parte apelante. El testimonio de Rivera Padilla coincidió con las descripciones dadas por el testigo Aquino Rivera, así como con la prueba videográfica, y fue, a su vez, corroborado por el agente Bisbal Torres. Incluso, el foro juzgador no solamente le mereció credibilidad al testimonio vertido por Rivera Padilla, sino que realizó una serie de preguntas al agente Bisbal Torres para asegurarse de que Rivera Padilla, al momento de ser entrevistada como parte de la investigación del caso y de identificar al asaltante como el aquí

apelante, se encontraba en buen estado físico y mental, entendía las razones por cuales estaba siendo entrevistada y estaba segura de su identificación. De la referida transcripción, se desprende, además, que el foro *a quo* les mereció credibilidad a los testigos presentados por el Ministerio Público y, por no encontrar prejuicio, parcialidad o pasión en su apreciación de la prueba, le damos entera deferencia.

Examinada la totalidad de las circunstancias, así como toda la prueba que tuvo ante sí el foro de origen, colegimos que la identificación del apelante como el autor de los hechos delictivos perpetrados el 16 de septiembre de 2020 fue correcta en Derecho. Además, evaluado el expediente ante nos, los autos originales, la evidencia desfilada y la transcripción de la prueba oral, determinamos que el caso fue probado más allá de duda razonable. Por tanto, concluimos que el primer error señalado no se cometió.

Como cuarto señalamiento de error, la parte apelante aduce que el foro *a quo* incidió al admitir prueba de referencia a pesar de la oportuna objeción de la defensa cuando el testigo no estuvo disponible para confrontarlo en violación a este derecho y al debido proceso de ley. Alega que el testimonio de Olivo Crespo, vertido por medio del testimonio del agente Bisbal Torres, es insuficiente para cumplir con el requisito de la prueba independiente que exige la Regla 803(e) de Evidencia de Puerto Rico, *supra*. Plantea que dicho testimonio fue erróneamente admitido por el foro sentenciador. En virtud de ello, sostiene que la admisión en evidencia de dicha prueba violentó su derecho a un debido proceso de ley y que se probara su caso más allá de duda razonable.

Por su parte, el apelado arguye que las manifestaciones realizadas por el coautor, Olivo Crespo, son admisibles contra el apelante bajo la Regla 803(e) de Evidencia de Puerto Rico, *supra*, dado que se efectuaron durante la vigencia de la conspiración para cometer el delito de robo; esto, luego de que ambos, acompañados

por Rivera Padilla, salieran a "dar vueltas" con el propósito de asaltar en una gasolinera. Plantea que las declaraciones de Olivo Crespo quedaron corroboradas con vasta evidencia. Sostiene que, en el caso de autos, se presentó amplia prueba independiente que sustenta la culpabilidad de los cargos y, por tanto, no se hubiera alterado el resultado de culpabilidad. En la alternativa, alega que, de entenderse como inadmisibles las declaraciones de Olivo Crespo, no pueden conllevar la revocación de las sentencias dictadas en contra del apelante, toda vez que se trata de un error no perjudicial (*harmless constitutional error*) que no acarrea automáticamente la revocación de la condena porque el resultado alcanzado por el foro juzgador se hubiera sostenido con suficiencia constitucional.

Contrario a lo propuesto por las partes, no estamos ante un testigo que no estuvo disponible, sino ante una evidente prueba de referencia donde el Ministerio Público introdujo las declaraciones de Olivo Crespo –un conspirador en los hechos delictivos que dieron génesis al caso de epígrafe–, mediante el testimonio del agente Bisbal Torres, quien lo entrevistó como parte de la investigación del caso. Aunque la defensa objetó oportunamente la admisión de esas declaraciones, el foro *a quo* las permitió al amparo de la Regla 803(e) de Evidencia de Puerto Rico, *supra*.

En la segunda parte de este escrito detallamos que la Regla 803(e) de Evidencia de Puerto Rico, *supra*, permite, a manera de excepción, la admisión en evidencia de las declaraciones de una persona conspiradora hecha en el transcurso de la conspiración y para lograr su objetivo. En ese sentido, no es necesario probar la conspiración más allá de toda duda razonable, sino que la decisión del juzgador se regirá por la preponderancia de la evidencia. Como cuestión de umbral, las declaraciones bajo dicha regla deben hacerse durante la vigencia de la conspiración. De incumplir con el mencionado requisito, dichas declaraciones serán inadmisibles.

Surge de la transcripción de la prueba oral, que las declaraciones que Olivo Crespo le realizó al agente Bisbal Torres no surgieron durante la vigencia de la conspiración en cuestión. Por el contrario, estas se dieron como parte de una entrevista realizada por el agente Bisbal Torres luego de perpetrados los hechos y después que Olivo Crespo fuera entregado por un familiar a las autoridades. Nuestro ordenamiento jurídico es enfático en requerir que la declaración se haga cuando la conspiración estaba en proceso; es decir, perfeccionado el acuerdo y antes de terminada la conspiración. Esos no son los hechos fácticos que tenemos ante nos, por lo que el Tribunal de Primera Instancia estaba impedido de admitir la mencionada prueba de referencia, pues esta no cumplía con lo requerido por la excepción contemplada en la Regla 803(e) de Evidencia de Puerto Rico, *supra*. En conclusión, el cuarto señalamiento de error se cometió.

Ahora bien, lo anterior no tiene el efecto de invalidar las sentencias aquí apeladas. Eliminado el testimonio del agente Bisbal Torres en cuanto a lo declarado por Olivo Crespo, la prueba desfilada ante el foro juzgador probó la comisión por Durán Gutiérrez de los delitos imputados más allá de duda razonable, conforme concluimos en el análisis del primer error señalado. A ello le añadimos que dicha prueba pasó por el crisol de un tribunal de derecho y no un panel de jurados; es decir, no estamos ante un escenario donde una prueba de referencia como la antes descrita pudiera causarle alguna impresión indebida al jurado que resultara en un error perjudicial. Estamos convencidos más allá de duda razonable que, de no haberse cometido el referido error, el resultado aquí apelado hubiera sido el mismo. Por consiguiente, resulta forzoso confirmar las sentencias apeladas.

Por último, el apelante plantea que el foro primario erró al imponer el pago de la pena especial, aun cuando hay una

determinación de indigencia desde el inicio del caso. Indica que, según surge de los autos originales, el 23 de octubre de 2020, la Sociedad para Asistencia Legal había presentado una *Moción Informativa sobre Indigencia y Representación Legal*, mediante la cual informó que asumía la representación legal del apelante, ya que cualificaba para recibir los servicios por ser indigente. Aclara que, en el curso del proceso de juicio, otro abogado asumió su representación legal; sin embargo, no hubo cambios en su situación económica, puesto que fue encontrado culpable e ingresado en la cárcel. Señala que, en el proceso de apelación, está siendo representado por la Sociedad para Asistencia Legal. Explica que, al existir una determinación inicial de indigencia y por haber estado representado inicialmente y en el trámite apelativo por la Sociedad para Asistencia Legal –que es una institución que ofrece representación legal gratuita a indigentes–, ello corrobora su condición de indigencia. Por tal razón, alega que la pena especial impuesta no procedía.

Por su lado, la parte apelada sostiene que la Ley Núm. 34-2021, *supra*, no reconoce una exención automática al pago de la pena especial a quienes hayan sido representados por la Sociedad para Asistencia Legal. Argumenta que la Sección 4 del citado estatuto dispone que el foro juzgador "podrá" eximir a un convicto del pago de la pena especial, lo cual implica que la Asamblea Legislativa les confirió a los tribunales una facultad discrecional en este ámbito, aun cuando se cumpla con alguno de los requisitos del estatuto. Plantea que es incorrecto pretender que una determinación de indigencia, sin más, trae consigo una exención automática al pago de la pena especial, cuando tal interpretación no se ajusta al texto de la referida sección y derrotaría el fin apremiante de mantener la solvencia económica del *Fondo de Compensación y Servicios a las Víctimas y Testigos de Delito*, si toda una categoría de

litigantes recibiera una exención automática con la mera presentación de una certificación de indigencia. Arguye, además, que la parte apelante tampoco reclamó una exención por motivo de indigencia cuando fue sentenciado, sino que, por primera vez, incoa este remedio ante esta instancia apelativa.

Conforme a lo previamente esbozado, la Ley Núm. 34-2021, *supra*, dispone que, luego de dictada la sentencia, el tribunal, *motu proprio* o a solicitud de la persona convicta, podrá eximir a la persona convicta del pago de la pena especial, siempre y cuando se cumpla con al menos una de varias condiciones precitadas. Además, dicho estatuto establece algunas circunstancias en las que la indigencia de la persona convicta se presumirá. Asimismo, la persona convicta podrá presentar una petición para la celebración de una vista con el fin de considerar la concesión de la exención o el pago a plazos de la pena especial. Celebrada la vista, el foro primario determinará si procede la exención, el pago a plazos o el saldo total de la pena especial impuesta a la persona convicta.

En el caso de autos, el Tribunal de Primera Instancia declaró culpable a Durán Gutiérrez y, entre otros, le impuso el pago de una pena especial a tenor con la Ley Núm. 34-2021, *supra*. De los autos originales no surge que el apelante solicitara ante el foro *a quo* un remedio post-sentencia para que se le eximiera del pago de la referida pena especial por razón de indigencia. Constatamos que, en efecto, dicho reclamo se hace por primera vez ante este Foro revisor. Ello no se realizó al momento de la impartición de la sentencia ni como remedio post-sentencia ante el foro de origen, a quien le corresponde determinar, luego de la celebración de una vista a esos efectos, si una solicitud de tal naturaleza procede, conforme a las exigencias consagradas en la Ley Núm. 34-2021, *supra*. Por tanto, el señalamiento de error discutido no se cometió, toda vez que este Foro apelativo no puede revisar lo que no fue levantado

oportunamente ante el foro juzgador. No obstante, si bien el error señalado no se cometió, el apelante aún tiene un remedio post-sentencia que puede solicitar ante el Tribunal de Primera Instancia a esos efectos.

Estudiada cuidadosamente la transcripción de la prueba oral, examinados los autos originales, así como la prueba documental y fotográfica, y habiendo dado la debida consideración a los alegatos de las partes de epígrafe, procede confirmar los dictámenes apelados.

**IV**

Por los fundamentos que anteceden, confirmamos las *Sentencias* apeladas, en todos sus extremos.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones